Catherine **JOHNS**, Appellant

v.

Frank **CIOCI**, Appellee.

Superior Court of Pennsylvania.

Argued Dec. 1, 2004.

Filed Dec. 30, 2004.

Dorothy K. Phillips, Philadelphia, for appellant.

Susan J. Sacchetta, Paoli, for appellee.

Before: JOYCE, GANTMAN and BECK, JJ.

BECK, J.:

¶ 1 This is a custody dispute involving the twelve year old daughter of divorced parents who was in the primary physical custody of her mother for approximately a decade. After Father petitioned for modification of custody and Mother petitioned for relocation, the trial court held a consolidated hearing. The trial court then denied Mother's petition for relocation and granted Father primary physical custody. We affirm the court's denial of Mother's petition for relocation; however, we reverse the court's order granting primary physical custody to Father and remand for further proceedings.

I

¶ 2 Appellant Mother and Appellee Father were divorced in Delaware in 1994 after approximately four years of marriage and the birth, in April 1992, of one child. By orders of a Delaware court in 1996 and 2000, parents shared legal custody, Mother had primary physical custody, and Father had partial physical custody. Both parties have remarried. Mother moved to Pennsylvania with permission of the Delaware court, but Father has continued to reside in Delaware. In September 2003, the Court of Common Pleas of Chester County entered an order, by agreement of the parties, that retained the structure of the custody arrangement originally ordered in Delaware. Mother had primary physical custody of the child, and Father had custody every other weekend and one afternoon during the week. The parties' relationship has been characterized by poor communication, frequent disagreements, and numerous court appearances.

¶ 3 After negotiations for at least several months in 2003, Mother's husband accepted new employment in Virginia in January 2004. Mother now wishes to relocate to that state with the child. On December 8,

2003 Father filed a petition to modify custody, and on January 29, 2004, Mother filed a petition for relocation. Mother's proposed new home in Virginia is approximately two hours from Father's home in Bear, Delaware, representing approximately a doubling of the distance between their current residences.

¶ 4 On February 20, 2004, the parties appeared before a custody conciliator. On March 1, 2004, the Court of Common Pleas of Chester County ordered implementation of the recommendations of the custody conciliator: the custody arrangement was to be maintained, but Dr. Bruce Mapes was to conduct a full custody evaluation.

¶ 5 A custody trial, consolidating the petitions of Mother and Father, began on March 15, 2004. Father renewed his request for a full custody evaluation, but Mother objected, arguing that time was of the essence since her husband had already moved out of state. The trial court first considered Father's petition for modification, beginning on March 16, 2004. Father was the only witness to testify on that date.

¶ 6 On March 17, both Mother and Father met with Dr. Mapes as part of the custody evaluation. When trial resumed on March 18, 2004, the court indicated that a full custody evaluation would not be necessary at this time, leaving open the possibility that a full evaluation might be required at a future date. The trial judge also stated that he had spoken with Dr. Mapes by phone after the interviews with Mother and Father and that Dr. Mapes had detected no mental pathology in either party. Although the parties were given the opportunity to supplement the record with Dr. Mapes' testimony, neither chose to call him to testify.

¶ 7 Witnesses who testified on March 18 and 19, 2004 included Mother, step-father,

step-mother, step-father's mother, the child's school principal and the child. The court questioned the child with counsel present. The trial judge had required the parties to submit questions that they wished him to ask during the interview. The court did not directly ask the child her preference with regard to custody, but did seek information from her regarding her relationship with her parents and her interactions within their two households.

¶ 8 On March 23, 2004 the court heard testimony from step-father, Mother, and Father specifically relating to Mother's petition for relocation. The court then ordered the parties to deliver briefs.

¶ 9 The parties entered into settlement talks and requested an extension from the court. In a letter dated Wednesday, March 30, 2004, the court granted the extension, but also noted that it was "inclined" to award primary custody to Father and to deny Mother's petition for relocation. The court's letter stated that if the case had not settled by Friday, the court would issue the "appropriate" order.

¶ 10 The court subsequently received a letter signed by the child and dated April 12, 2004, expressing her desire to live with her mother. The court returned the letter to the child, advising her that such information, being *ex parte*, could not appropriately be seen by the judge and that any other correspondence should be directed to her mother's attorney. We note that neither Mother nor Father introduced this letter into evidence at any proceeding, and the circumstances surrounding its writing are unclear.

¶ 11 On April 15, 2004, the court issued a temporary order that granted Father's petition for modification and denied Mother's petition for relocation. Mother then filed a petition to reopen, with the child's letter attached. The court denied the petition. On May 26, 2004, the court entered a detailed custody order that transferred primary physical custody to Father, granted Mother partial physical custody, and provided for shared legal custody.

¶ 12 On June 2, 2004, Mother filed a notice of appeal and emergency application for a stay of the May 26, 2004 custody order. This Court stayed the trial court's order and remanded for an evidentiary hearing, which took place on June 9, 2004. The child's school principal, guidance counselor, and the child testified. The evidence revealed that on June 1 (approximately the time that Father was to assume primary custody) the child had been distraught at school, expressing her emotions in writing and verbally.

¶ 13 On June 11, 2004, the trial court vacated the temporary stay and affirmed its May 26 order granting primary physical custody to Father. The trial court issued a detailed opinion on August 11, 2004.

¶ 14 The child started classes in her new school near Father's residence in Delaware in late summer 2004. Shortly thereafter, in mid-September, Mother filed an emergency application for stay of enforcement of the custody orders of May 26 and June 11, 2004, and Father filed an emergency petition seeking sole legal custody so that he could immediately take the child to a counselor without Mother's consent. In their petitions, both parties similarly recounted several recent events of concern involving the child. Specifically, the child was performing poorly in school, in contrast to her excellent academic performance in previous years. In addition, she had run away from Father's home, ending up in a scuffle at the local police station. We note that no documents or testimony in support of these allegations has been admitted into evidence in any proceeding. However, we also note that after a hearing

on September 27, 2004, the trial judge agreed that the child's problems were sufficiently serious to warrant immediate counseling.

¶ 15 The order under appeal is the order from May 26, 2004, which incorporates the temporary order of April 15, 2004 and was affirmed by the June 11, 2004 order. Mother asks the court to vacate this order, to reinstate the order in existence on February 20, 2004, and to remand for a new trial before a different judge.

## II

¶ 16 In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. *McMillen v. McMillen,* 529 Pa. 198, 202, 602 A.2d 845, 847 (1992); *Dranko v. Dranko,* 824 A.2d 1215, 1219 (Pa.Super.2003). This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. *McMillen, supra* at 202, 602 A.2d at 847. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. *Jackson v. Beck,* 858 A.2d 1250, 1254 (Pa.Super.2004); *Dranko, supra* at 1219 (citing *Robinson v. Robinson,* 538 Pa. 52, 57, 645 A.2d 836, 838 (1994)); *Andrews v. Andrews,* 411 Pa.Super. 286, 601 A.2d 352, 353 (1991), *affirmed,* 533 Pa. 354, 625 A.2d 613 (1993). However, we are not bound by the trial court's deductions or inferences from its factual findings. *McMillen, supra* at 202, 602 A.2d at 847. Ultimately, the test is "whether the trial court's con-

clusions are unreasonable as shown by the evidence of record." *Dranko, supra* at 1219 (quoting *Wheeler v. Mazur,* 793 A.2d 929, 933 (Pa.Super.2002)). We may not interfere with the trial court's factual conclusions unless they are unreasonable in light of the factual findings, and thus represent a "gross abuse of discretion."[1] *Robinson v. Robinson,* 538 Pa. 52, 56, 645 A.2d 836, 837–38 (1994); *Jackson, supra* at 1252 (quoting *Luminella v. Marcocci,* 814 A.2d 711, 716 (Pa.Super.2002)); *Graham v. Graham,* 794 A.2d 912, 914–15 (Pa.Super.2002) (quoting *Vineski v. Vineski,* 450 Pa.Super. 183, 675 A.2d 722, 723 (1996)); *S.M. v. J.M.,* 811 A.2d 621, 623 (Pa.Super.2002).

¶ 17 With any child custody case, including petitions for modification or relocation, the paramount concern is the best interests of the child. *Robinson, supra* at 56, 645 A.2d at 838; *McMillen, supra* at 202, 602 A.2d at 847; *Dranko, supra* at 1219. This standard requires a case by case determination of all the factors that may legitimately affect the "physical, intellectual, moral and spiritual well-being" of the child. *Dranko, supra* at 1219 (quoting *Wheeler, supra* at 933).

¶ 18 A custodial parent's petition for relocation must be analyzed according to the standard set forth by this Court in *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990). First the court must consider the prospective benefits of the move, considering non-economic as well as economic factors, to determine if the move is likely to improve substantially the quality of life for the custodial parent and the child. *Id.* at 439. The custodial parent bears the burden of proof with regard to this first

1. Our Supreme Court has clarified that whether the standard of review is articulated as "gross abuse of discretion" or simply "abuse of discretion," the test is the same: whether the trial court's conclusions are un-

reasonable based upon the evidence of record. The use of "gross" is mere surplusage. *Moore v. Moore,* 535 Pa. 18, 28 n. 4, 634 A.2d 163, 168 (1993).

prong. *Id.* at 440. Second, the court must consider the motives of both parents. The relevant standard for this prong with regard to the custodial parent is that the move must not be motivated by a desire to thwart visitation by and a relationship with the non-custodial parent. *Id.* at 439; *Ferdinand v. Ferdinand,* 763 A.2d 820, 824 (Pa.Super.2000), *appeal denied,* 566 Pa. 682, 784 A.2d 118 (2001). One aspect to this determination is whether the custodial parent will cooperate with visitation arrangements with the non-custodial parent. *Gruber, supra* at 439. Third, "the court must consider the availability of realistic, substitute visitation arrangements" between the child and the non-custodial parent. *Gruber, supra* at 439. This Court has made clear that in any relocation petition, "the personal happiness of the relocating parent cannot be the only or the predominant factor," but rather the best interest of the children is the "ultimate guidepost." *Meyer–Liedtke v. Liedtke,* 762 A.2d 1111, 1114 (Pa.Super.2000).

 ¶ 19 A party seeking modification of custody arrangements has the burden to show that modification is in the child's best interest. *McMillen, supra* at 202, 602 A.2d at 847. In evaluating whether a modification of custody is in a child's best interest, the court "has an obligation to consider all relevant factors that could affect the child's well-being." *DeNillo v. DeNillo,* 369 Pa.Super. 363, 535 A.2d 200, 202 (1987); *see also In re Davis,* 502 Pa. 110, 122–23, 465 A.2d 614, 620 (1983). One substantial factor, although not the sole one, is the role that one parent has assumed as the primary caretaker of the child. *Brooks v. Brooks,* 319 Pa.Super. 268, 466 A.2d 152, 156–57 (1983). "[W]hen both parents are otherwise fit, one parent's role as the primary caretaker may be given weight as the determining factor in a custody determination." *Wheeler v. Ma-*

*zur,* 793 A.2d 929, 935 (Pa.Super.2002) (quoting *Wiseman v. Wall,* 718 A.2d 844, 851 (Pa.Super.1998)). The court must give attention to the benefits of continuity and stability in custody arrangements and to the possibility of harm arising from disruption of long-standing patterns of care. *Jackson, supra* at 1252; *Wheeler, supra* at 937; *Gonzalez v. Gonzalez,* 337 Pa.Super. 1, 486 A.2d 449, 452 (1984).

### III

 ¶ 20 We first consider Mother's petition for relocation, which the trial court denied, based upon its analysis under *Gruber.* The trial court held that Mother had not met her burden of proof with regard to any of *Gruber's* three mandatory prongs. Mother argues that the trial court's denial of her petition constitutes abuse of discretion. We disagree with Mother and affirm.

¶ 21 Under the first prong of *Gruber,* Mother bore the burden of showing that the proposed relocation to Virginia would substantially improve the quality of life for her and her child. Mother and step-father testified that the primary benefit of the proposed relocation would be economic: increased compensation to step-father and thus increased financial security for the family. The trial court did not find the evidence of record to support these proposed benefits credible.

¶ 22 The following evidence concerning economic factors was presented at trial. Step-father's new employment in Virginia pays him an annual salary of $160,000, with the *possibility* of additional compensation through a bonus and stock options. His compensation for 2003, the last year in his old job, totaled $159,000, with $125,000 coming from salary and $34,000 from a bonus. By terms of his current employment agreement, step-father remains an at-will employee, and his guaranteed com-

pensation (and thus his financial security) extends at best only for two years. Mother testified that, if permitted to relocate, she intended to quit her job as a kindergarten teacher. The trial court found that the family already enjoys a prosperous lifestyle, as evidenced by numerous vacations to Europe and elsewhere, expensive cars, and a large house on nearly an acre of land in Chester County. Step-father testified that the family's lifestyle would not change significantly in Virginia. Based on this evidence, the trial court concluded that the proposed move was not likely to improve substantially the child's quality of life in an economic sense. As the trial court's conclusion has support in the evidence and was reasonable, we must agree.

¶ 23 Although Mother testified that the primary benefit to the proposed relocation was economic, she also suggested some non-economic advantages. First, Mother testified that she intended to stay at home rather than seek outside employment and therefore would have more time with her child. However, Mother is employed as a kindergarten teacher, and thus her working hours for the most part correspond with her child's school hours. Mother is presently at home with the child after school. Mother also qualified her intentions with regard to employment, recognizing that her desire to remain out of the workforce might be tempered by her husband's final income and the family's expenses in their proposed new home. Given that Mother's current schedule makes her readily available to her child after school and that her plans to stop working outside of the home are of necessity speculative at this time, the likelihood of substantial improvement in the child's quality

of life due to Mother's retiring from the workforce was not proven.

¶ 24 Mother and step-father also testified that benefits to the child would accrue from living in the planned suburban community to which they hoped to move in Virginia. They noted the many bicycle and walking trails as well as parks and recreational facilities. However, other testimony was taken as to the presence of similar trails, parks and recreational facilities in Chester County and Delaware. Mother's contention that residence in a planned community in Virginia represents an inherent and substantial improvement over the child's current residence in Chester County is untenable.

¶ 25 Finally, the trial court found that the school which the child currently attends is similar to the proposed school system in Virginia. Recognizing that the child is an academically gifted student, both parents researched the options for the child's education and presented their opinion testimony to the court. Their testimony indicated that both school systems have mechanisms in place for dealing with gifted students. Based on this evidence, the court found that relocation to Virginia would not yield a substantial improvement in the child's education. We will not reverse the trial court's factual determinations when, as here, they have support in the record.

¶ 26 The trial court also properly noted that the family has no ties to Virginia. See *Gruber, supra* at 440; *Geiger v. Yeager,* 846 A.2d 691, 698 (Pa.Super.2004); *Dranko, supra* at 1221–22. All the child's relatives with whom she has a relationship live in Delaware.[2] The child regularly visits her paternal grandparents and other relatives in Delaware when she is in the custody of her Father.

2. The only exception is step-father's family, which resides in England. Interactions with this family would not be altered by the proposed relocation.

¶ 27 In concert with the trial court, we find that no evidence of record supports Mother's view that the proposed relocation will yield a substantial improvement in the child's quality of life. Furthermore, the increased distance from the child's Father and her paternal extended family is a detrimental aspect of the proposed move. In light of all of the above factors, we affirm the trial court's conclusion that Mother did not meet her burden of proof with regard to the first prong of *Gruber*.

¶ 28 *Gruber's* second prong required the court to assess the motives of each parent. One aspect of this assessment, and the one on which the trial court focused, is a determination of whether Mother would likely cooperate with the alternate visitation arrangements that would be necessitated by the proposed relocation. *Gruber, supra* at 439. The trial court found that Mother did not meet her burden of proof in this regard, based primarily on her prior, often difficult and unbending behavior in dealing with Father on matters of visitation, as well as on her statement to step-mother that she would move farther away if Father did not change his behavior. Not surprisingly, the parents have divergent views regarding the roots of their acrimonious relationship, and the court heard conflicting testimony about the underlying reasons for their frequent arguments over the child's visits with Father. The trial court made clear that it did not find Mother's testimony credible and that it found her assurances of future collaboration with Father to be self-serving. We are bound by the trial court's credibility determinations. *Robinson, supra* at 55–57, 645 A.2d at 837–38; *Jackson, supra* at 1254; *Geiger, supra* at 699. The resolution of conflicting testimony is appropriately the purview of the trial court and we will not reverse absent an abuse of discretion. *Jackson, supra* at 1254.

¶ 29 We do not, as the trial court often seems to, put all the blame on Mother for the numerous custody disagreements that have taken place between these parents. Nonetheless, in her petition for relocation, Mother bore the burden of proving that she would comply in a cooperative way with the visitation arrangements with Father. *Gruber, supra* at 440. When the custodial parent seeks to relocate with the child, "[t]he task of this court is to sacrifice the non-custodial parent's interest as little as possible ...." *Id.* at 438. The child has had a close and loving relationship with both parents throughout her life. To grant Mother's relocation petition, the court required confidence that Mother, as the custodial parent, would facilitate the child's continuing relationship with Father, the non-custodial parent. Mother must be committed to the child's interest in maintaining her close relationship with her Father. In addition, Mother must respect the interest of Father in sharing his child's love and in rearing her to adulthood. *See Gruber, supra* at 438–39. The trial court was not confident that Mother's approach to the child's visitation with Father would encompass these two important interests.

¶ 30 We agree with the trial court that Mother's past behavior with respect to visitation arrangements is a relevant consideration in the assessment of her future behavior. Mother admitted in her testimony that her strict and inflexible interpretation of the prior custody order did not serve to foster a relationship between Father and child. Given the deference that this Court must give to the trial court's determinations of credibility and resolutions of conflicting evidence, we can find no abuse of discretion in the trial

court's finding that Mother did not meet *Gruber's* second prong.

¶ 31 In the third *Gruber* prong, the trial court addressed the alternate visitation arrangements proposed by Mother and found them less than adequate. We need not further consider this prong, since we affirm the trial court's conclusion that Mother did not prove the first *Gruber* prong, *i.e.,* that relocation would substantially improve the child's quality of life. This Court has previously held that consideration of alternate visitation · arrangements is not required under such circumstances. *Dranko, supra* at 1220–21.

¶ 32 Finding that Mother has not met her burden of proof with regard to the first two prongs of the *Gruber* analysis, we affirm the trial court's denial of Mother's petition to relocate.

### IV

¶ 33 We turn now to Father's petition for modification, which the trial court granted, transferring primary physical custody of the child from Mother to him. Mother contends that the trial court abused its discretion in transferring primary physical custody to Father, apparently disregarding the fact that Mother has been the primary care-giver for almost all of the child's life; in not ordering a full custody evaluation; in not directly inquiring as to the child's preference during the court's first interview with the child; and in not affording significant weight to the preference stated by the child in the court's second interview with her.

¶ 34 We hold that the trial court abused its discretion in transferring primary physical custody to Father without directly assessing the benefits of stability in custody arrangements and the potential harm to the child from disruption of her longstanding patterns of care. In addition, we hold that the trial court's factual conclu-

sion that the parental households are not equally suitable was unreasonable and thus an abuse of discretion. Finally, we hold that the trial court did not give adequate consideration to the child's expressed preference to live with her Mother. We discuss each trial court error in turn below.

■■■ ¶ 35 First, the trial court erred in not directly and thoroughly considering the potential deleterious effect on the child of a change in primary physical custody. Exceedingly little testimony in the voluminous record is devoted to this issue. The trial court's opinions and orders barely mention the benefits of stability in this child's custody arrangements and give no attention to the potential dangers of disruption of established patterns. Although we are aware that the benefit of maintaining established patterns of care constitutes only one factor in the best interest of the child analysis, we find that the trial court in this case failed to give this factor adequate consideration and weight.

¶ 36 The child in this case has lived with Mother for her whole life. She was two years old when her parents divorced in 1994, and Mother has had primary physical custody since that time. The loving relationship and emotional bond between Mother and child are not in dispute. The child has developed into an articulate, intelligent, academically successful young person while in the primary care of her Mother. However compelling Father's case for modification may be, any benefits of a change in custody must be weighed against the benefits of stability and the potential harm of an abrupt switch in primary caregiver. The trial court abused its discretion by giving virtually no consideration to Mother's historical role as caregiver.

■■■ ¶ 37 The second trial court error is the factual conclusion that Father's

household is more suitable for the child. There is no competent evidence to support this conclusion. The households are clearly different, as explained by the child in her testimony:

Court: One of the things I want to try to understand is that the difference is [sic] between what goes on in your mom's house and what goes on in your dad's house. Can you explain how things are different there?

Child: Well, my dad's house, there's more people.

Court: Okay.

Child: There's always a lot more going on with a lot more people.

Court: I see you smile when you say that.

Child: Yeah.

Court: Do you like that or not like that?

Child: I like both houses.

Court: Okay.

Child: At my mom's house, I'm the only child so I get a lot of attention.

Court: Do you like that? I see you smiling about that, too.

Child: Yeah, I like a lot of—I like having siblings and I like being the only child. I like both.

Court: Okay.

Child: Because it's just a change. I don't know.

N.T. 3/19/04 at 657–58.

¶ 38 The trial court found Father's household more suitable because it was more stable and family-oriented, allowing the child to reside with other children and to interact frequently with Father's extended family. In contrast, the trial court viewed Mother's household as less suitable because it was less stable and Mother's living arrangements for the future were uncertain; she was presently living apart from her husband, who had moved to Vir-

ginia; and she has little if any contact with her extended family. Based on the facts of record, the trial court's conclusions with regard to the superiority of Father's household were unreasonable and thus an abuse of discretion.

¶ 39 Although we find unreasonable the trial court's conclusions about Mother's household, we stress that we do not for a moment condone Mother's manipulative behavior, nor her decision to relocate without consulting Father. As stated clearly by the trial court, Mother's pattern of behavior with regard to Father's legitimate custody rights weighs against her in a determination of best interests of the child.

¶ 40 But these unfortunate traits do not negate the fact that Mother has for the past decade provided a loving home in which the child has thrived. The court makes much of her unwillingness or inability to predict her place of residence in the future, but we see no evidence that she would be unwilling or unable to provide as loving a home in the future as she has in the past. At least for the short term Mother has been clear about her plans— she testified that she would remain in Pennsylvania if the court denied her petition to relocate to Virginia. Mother and step-father have the financial resources to maintain households in both Pennsylvania and Virginia, although a move to a smaller house may be required. Step-father expressed a desire ultimately to return to England, the country of his birth, but he made clear that such plans were not to be executed until the child is grown. From this record, there is no competent evidence to support a level of instability in Mother's household that would give rise to concern for the best interests of the child.

¶ 41 In comparing households, the trial court also contrasted Mother's lack of interaction with her siblings and other rel-

atives to Father's close relationship with his extended family. Mother testified that her sole relative in the area is a sister whom she does not see regularly.[3] We fail to see how Mother's lack of relationship with her extended family reflects poorly on the home environment that she has provided for her child. Furthermore, there is no reason to believe that Mother's failure to maintain close ties with her family has had a negative effect on the child. Unless it is shown that a parent's conduct has had a harmful effect on the child, that conduct should be given little weight in custody determinations. *Wheeler, supra* at 936. Mother's testimony alluded to some difficult family relationships in her past. Her desire to dissociate from them is appropriately a decision for Mother to make, and the trial court's negative inference about Mother due to her decisions in this regard was unreasonable.

¶ 42 For reasons that are not at all clear, the trial court appears to make no positive inferences from the good relationship that Mother, step-father, and child have with step-father's family in England. Visits between the family members are frequent, in spite of the distance. Step-father's mother gave undisputed testimony at the custody hearing that she considers the child her granddaughter, sees her several times a year, talks on the phone with her regularly, and enjoys her confidence. The trial court did not appear to attach any significance to the child's relationship with her step-father's family, particularly her step-grandparents.

¶ 43 We do not minimize the importance to the child of the frequent interactions that she enjoys with the many paternal relatives who live near Father. We do not question the joys and benefits of growing up secure in the love of an extended family. We simply fail to see, on this record, how Mother's lack of relationship with her siblings can support the trial court's conclusion that Mother's home is less suitable.

¶ 44 Another benefit of Father's household cited by the trial court is the presence of two other daughters.[4] As recognized by the trial court, the policy in Pennsylvania is to permit siblings to be raised together, whenever possible (the doctrine of "family unity" or "whole family doctrine"). *Wiskoski v. Wiskoski*, 427 Pa.Super. 531, 629 A.2d 996, 999 (1993), *appeal denied*, 536 Pa. 646, 639 A.2d 33 (1994). Absent compelling reasons to separate siblings, they should be reared in the same household to permit the "continuity and stability necessary for a young child's development." *Pilon v. Pilon*, 342 Pa.Super. 52, 492 A.2d 59, 60 (1985). This policy does not distinguish between half-siblings and siblings who share both biological parents. *Davis, supra* at 124, 465 A.2d at 621. However, this Court has made clear that the policy against separation of siblings is only one factor—and not a controlling factor—in the ultimate custody decision. *See, e.g., E.A.L. v. L.J.W.*, 443 Pa.Super. 573, 662 A.2d 1109, 1118 (1995); *Cardamone v. Elshoff*, 442 Pa.Super. 263, 659 A.2d 575, 583–84 (1995); *M.D. v. B.D.*, 336 Pa.Super. 298, 485 A.2d 813, 816–17 (1984). In the majority of cases in which

3. Mother also testified that her parents are deceased and that she does not know the whereabouts of her two brothers, primarily because they have been in and out of prison.

4. Two other children, both girls, reside with Father and step-mother. Gabriella, age four, is the biological daughter of Father and step-mother. Jessica, age nine, is step-mother's biological daughter from a previous relationship. Although it was not clear from the record if Father has adopted Jessica, she calls him daddy and has no relationship with her biological father.

this doctrine has been invoked, the children have been reared together prior to separation or divorce of the parents. *See, e.g., Ferdinand, supra* at 823–24; *Hockenberry v. Thompson,* 428 Pa.Super. 403, 631 A.2d 204, 206–07 (1993); *Wiskoski, supra,* at 998–99. In cases where the siblings have not been reared in the same household, the force of the doctrine is less compelling. *See, e.g., E.A.L., supra* at 1118; *M.D., supra* at 816–17.

¶ 45 In the present case, the child has never lived in the same household with her younger sister. Furthermore, the younger child was born to Father and step-mother following the divorce of Mother and Father. We do not believe that the divorced parent who has another child by a subsequent relationship should thereby be favored in a custody decision regarding any older children, based on the whole family doctrine. Such an application of the doctrine would imply an unacceptable policy: that the parent who subsequently has additional children with a different partner is automatically favored in a custody dispute. This would be blatantly unfair to the parent who, by choice or fate, has no additional children. We therefore refuse to extend the laudable whole family doctrine to the present facts.

¶ 46 Thus we find no competent evidence to support the trial court's conclusion that Father's household is more suitable for the child than is Mother's household. Most certainly the households are different, but it was unreasonable, and hence an abuse of discretion, for the trial court to deduce from those differences that Father's household is superior.

¶ 47 The question of suitability of the households is particularly important because, when the households are equally suitable, the preference of the child can tip the scales in favor of one or the other. *McMillen, supra* at 204, 602 A.2d at 848; *Myers v. DiDomenico,* 441 Pa.Super. 341, 657 A.2d 956, 958 (1995). Even when the trial court gives little weight to a child's preference, that preference may still be determinative if the households are equally suitable. *Myers, supra* at 958.

¶ 48 In this case, the trial court held that *McMillen* did not apply because the parental households were not equally suitable. Trial Court Order, 6/11/04, at 4; Trial Court Opinion, 8/11/04, at 51. Thus the child's stated preference to live with her Mother was not permitted to tip the scale, and the ramifications from the trial court's unreasonable conclusions concerning the inequality of Father's and Mother's households were substantial.

¶ 49 Even if the households are not equivalently suitable for rearing the child, the child's preference is a factor that must be carefully considered in custody decisions, keeping in mind the child's maturity and intelligence, as well as the reasons that the child offers for the preference. *McMillen, supra* at 203, 602 A.2d at 847; *Myers, supra* at 958. We are mindful that the child's preference is not controlling and that the trial judge is in the best position to determine the weight to be given to the child's preference. *McMillen, supra* at 203, 602 A.2d at 847; *Myers, supra* at 958.

¶ 50 In this case, the trial court interviewed the child three times, once on March 19, 2004 and twice on June 9, 2004. In the first interview, the court did not directly ask the child her preference, but tried to elicit information about her feelings for both parents and their households.[5] The court concluded, and based on

5. Because of our holding on the overriding issue of custody, we need not resolve Mother's contention that the trial court erred in not directly asking the child her preference.

the record, we must agree, that the child was hesitant to decide between her parents and did not like being in the middle of their dispute. However, in June, after custody had been transferred to her Father, her testimony was more definitive, as shown by the following two examples:

Question (by Mother's attorney): Meghan, what—why was June 1st, the day that you wrote 'This is the worst day of my life,' why that day?

Child: Because I just hurt my dad's feelings, but I wanted to stay with my mom.

N.T. 6/9/04 at 124.

Court: Is there something else you wanted to tell me now?

Child: Yes

Court: What is that?

Child: I want to live with my mom.

Court: Can you tell me why?

Child: Because I like the school—

Court: You like what? I can't hear. You dropped your voice.

Child: I like the school, and I've always lived with her and I like living with her.

N.T., June 9, 2004, at 193.

¶ 51 The trial court concluded that the child's preference was not based on a good or consistent reason and therefore accorded it limited weight. Trial Court Order, 6/11/04, at 4–5; Trial Court Opinion, 8/11/04, at 52. The trial court also noted her young age as another factor in the limited weight given her preference. Trial Court Order, 6/11/04, at 5. We find the trial court's conclusion unreasonable, as it

has no evidentiary support in the testimony.

¶ 52 The child gave two good reasons—school and continuity—for wanting to stay with her Mother. Her young age does not preclude careful consideration of her preference and her reasons. Our case law has ample precedent in which the custody preference of eleven or twelve year old children was honored.[6] *See, e.g., McMillen, supra* at 202–03; 602 A.2d at 846; *Wheeler, supra* at 938. The child in the present case is an intelligent and articulate twelve-year old girl, who is academically gifted and excels in school. In essentially dismissing her testimony because of her youth or because it was deemed as not based on good or consistent reason, the trial court acted unreasonably and abused its discretion.

¶ 53 Because the trial court's factual conclusions are unreasonable based on the evidence of record, we vacate the order that granted Father's petition for modification. We remand for a new custody hearing under a different trial judge.[7] Pending the order from the new hearing, the present custody arrangements shall remain in effect.

¶ 54 We also direct the trial court to order a full custody evaluation prior to the new custody hearing. Dr. Bruce Mapes interviewed Mother and Father on March 17, 2004 as part of a custody evaluation. Dr. Mapes subsequently spoke with the trial judge, who relayed at trial Dr. Mapes' conclusion that neither party suffered from mental pathology. Dr. Mapes never testi-

---

6. The preference of much younger children has also been taken into evidence and given weight. *See, e.g., Gonzalez, supra* at 453; *In re Custody of Pearce,* 310 Pa.Super. 254, 456 A.2d 597 (1983).

7. Because of our resolution of this case, we need not address Mother's contention that the

trial court erred in overruling the order of another judge that called for a full custody evaluation. Similarly, we need not address Mother's contention that the trial court abused its discretion in not granting Mother's petition to reopen.

fied for either party and did not make a full custody evaluation. A full custody evaluation addresses more than the presence or absence of mental pathology, and the additional aspects of such an evaluation are needed to assist the court in this case.

¶ 55 Both parties love their daughter, have the ability and desire to provide for her well-being, and give high priority to her welfare. While we recognize that the child has flourished with Mother as primary caretaker, we are nonetheless concerned about the many examples of Mother's manipulative behavior and her failure to encourage the loving relationship that the child has with her Father. We also note the problems that the child has been experiencing since September 2004, when she started in a new school near her Father's residence. Although we appreciate appellee's point that these incidents have never been admitted into evidence, we note that the descriptions of the problematic incidents involving the child were very similar in Mother's and Father's petitions from September, 2004. We further note that, following a brief hearing on September 27, 2004, the trial judge found the problems sufficiently severe to agree that immediate counseling for the child was needed. Given the instability that this child has experienced and her apparently difficult adjustment, we believe a full custody evaluation is necessary.

¶ 56 In sum, we affirm the trial court's order denying Mother's petition to relocate. We vacate the trial court's order granting Father's petition to modify and awarding him primary physical custody. We remand for a full custody evaluation, followed by a new custody hearing before a different trial judge. The evaluation and hearing should be accomplished as quickly as is practicable, to satisfy the interests of finality and stability in custody arrange-ments for this child. We order that the current custody arrangements (*i.e.*, primary physical custody with Father) be retained pending the outcome of the new hearing, in the interest of stability for the child. We direct that the new hearing take place immediately following the custody evaluation.

¶ 57 Order affirmed in part and reversed in part. Jurisdiction relinquished.