**Sexton v. Haug**

C.P. of Bucks County, no. AO6-03-61759-C-28.

*Jeffrey Williams,* for plaintiff.
*Patricia Cooley,* for defendant.

GOLDBERG, *J.,* April 1, 2005—Renee Sexton (Mother) has appealed this court's child custody order of December 8, 2004, which provided Mother and Robert Haug (Father) with joint legal custody and equal physical custody of the parties' four children. We offer this opinion in support of our decision in accordance with Pa.R.A.P. 1925.

The history of the custody aspects of this domestic action are as follows: Mother and Father were married on November 30, 1991, and separated August 15, 2002. The marriage produced four children: Gabriel Haug (d.o.b. 12/16/93), Arielle Haug (d.o.b. 5/6/96), Luke Haug (d.o.b. 2/1/98), and Jeremy Haug (d.o.b. 5/12/00). By all accounts, the four children are thriving and well adjusted. Each child also has a loving and bonded relationship with both parents, despite the contentious nature of the relationship between Mother and Father and these proceedings.

While the parties were together as husband and wife, they lived in Jameson, Pennsylvania in a large single family home. Both Mother and Father were employed as chiropractors in an office that Mother started and Father later joined. In contemplation of children, Mother and Father structured their office hours to work on alternate days, so that, when one was at work, the other was home with the children. (N.T., 8/12/04, p. 37.) As a result, *both* parents spend considerable time with the children, changing their diapers, feeding and clothing them, and generally tending to their needs in an equal manner. Of the

two parents, Father did the majority of the housework, including cooking, cleaning, yard work, and at least some of the laundry.[1] (N.T., 8/12/04, pp. 46-47, 53.) Mother never disputed Father's substantial involvement with his children.

During the marriage, the parties maintained close relationships with both Mother's and Father's sides of the family. Mother's parents were in telephone contact with them on a daily basis and would see them several times per week. (N.T., 10/1/04, p. 67.) They also traveled and vacationed together. (N.T., 10/1/04, p. 68.) Father's brother and his family lived next door to the marital home. (N.T., 12/3/04, p. 243.) As Father and his brother each have children around the same ages, the two families would also see each other on an almost daily basis. (N.T., 12/3/04, pp. 243-44.)

On October 30, 1996, Mother was involved in a serious car accident that caused her physical injuries, including injuries to the brain. (N.T., 7/7/04, p. 55.) As a result of that accident, Mother suffered cognitive problems and anxiety attacks, and was unable to work for several months after the accident. (N.T., 7/7/04, pp. 46, 58.) After the accident, Father increased his role in taking care of the children. (N.T., 10/1/04, p. 70.) To make up for Mother's absence at the chiropractic office, Father also increased his work hours from approximately 10 to 15 hours per week to 20 to 25 hours per week. (N.T., 8/12/04, pp. 40-41.) While Father was working and Mother recovering from her injuries, other family members assisted in taking care of the children. (N.T., 8/12/04, pp. 42-43; 12/3/04, p. 218.)

---

1. The parties also employed a housekeeper who came to the house several hours a week. (N.T., 12/3/04, pp. 227-28.)

In May 1997, Mother returned to work Wednesday afternoons for three hours per week. (N.T., 7/7/04, p. 59.) During this time Mother and Father both continued to remain active in raising the children. Father continued to do the majority of the housework and tasks associated with raising four young children. Father routinely involved the children in the household activities. For example, he would have the children assist him in cooking by having them mix pancake batter, or other similar duties. Arielle in particular would later develop a love for cooking. (N.T., 8/12/04, p. 55.) By way of further examples, Father would have one of the boys sit on his lap while cutting the lawn with his riding mower (N.T., 8/12/04, p. 53), and the children would mimic Father with a toy vacuum when Father was vacuuming the floors. (N.T., 8/12/04, p. 55.)

In 2001, Mother told Father she wanted a divorce. (N.T., 8/12/04, p. 12.) After failed attempts at marriage counseling, the parties worked with the counselor to develop a separation plan. As part of that plan, the parties agreed that the separation would be amicable, and that they would first set up Mother and the children in a new home and then set up Father in a new home. (N.T., 10/1/04, pp. 210-13.) Father always desired equal custody of the children and believed that that would happen after he and Mother were settled in their new homes. (N.T., 10/1/04, pp. 228-29.)

On August 15, 2002, Mother and the children moved out of the marital residence to a new home that Mother purchased in Newtown, Pennsylvania.[2] (N.T, 7/7/04, p.

_____

2. Mother purchased the Newtown home with funds that she obtained by borrowing against the marital estate. (N.T., 12/3/04, p. 85.)

12; N.T., 10/1/04, p. 210.) This move was made in accordance with the parties' plan and with Father's cooperation and assistance, both financially and physically. (N.T., 8/12/04, p. 18.)

After separation, Father continued to see the children on a regular basis. By informal agreement, from August 2002 to October 2002, Father saw the children almost daily at Mother's home and had them in his custody every Saturday night and while Mother was at work. (N.T., 8/12/04, pp. 74-76; N.T., 12/3/04, p. 37.)

By the fall and winter of 2002, the parties' efforts at an amicable separation and divorce began to break down. In November or December 2002, Mother began to date Wayne Hirschbuhl. (N.T., 8/12/04, p. 30.) Mr. Hirschbuhl is approximately 20 years older than Mother and owns a pool installation business. He lives in a sizable home in Ivyland, Pennsylvania that he refers to as a "gentleman's farm." [3] (N.T., 10/1/04, p. 4.)

At approximately the time Mother began dating Mr. Hirschbuhl, Father stopped visiting the children at Mother's Newtown home as often. Father testified that he did so because he did not want to interfere in Mother's relationship with Mr. Hirschbuhl. (N.T., 12/3/04, pp. 37-38.) He did, however, continue to wish for an equal custody arrangement with Mother, and continued to have the children on Saturday nights and while Mother was at work. (N.T., 10/1/04, pp. 228-29.)

---

3. Mr. Hirschbuhl's home sits on a three and one-half acre property that also houses sheep, cats, horses and a dog. Mr. Hirschbuhl also rents another three acres across the street from his property for space for the horses. (N.T., 7/7/04, pp. 23-24.)

Mother's relationship with Mr. Hirschbuhl also strained her relationship with her parents, who have had very little contact with Mother since the end of 2002. (N.T., 10/1/04, p. 78.) Indeed, Mother's parents have not been inside Mother's home since she moved in with Mr. Hirschbuhl, and only see the children while they are with Father. (N.T., 10/1/04, pp. 86-87, 102.) Father's brother's and sister's testimony also made clear that their involvement with the children is limited to times when the children are with Father.

Beginning March 2003, Father increased his custodial time to have the older two children every Wednesday night and all four children on alternate weekends. (N.T., 7/7/04, p. 14; 8/12/04, p. 76.) In April 2003, Father ended his employment at the chiropractic office and began working for his brother's tree service and landscaping business. (N.T., 10/1/04, p. 168.) He took this job because it provided a salary that was similar to what he had been making with Mother as a chiropractor[4] and, most importantly, because it provided a very flexible schedule to allow him to spend time with his children. (N.T., 10/1/04, pp. 165-70.)

In May 2003, Mother and the children moved into Mr. Hirschbuhl's home. (N.T., 7/7/04, p. 21.) Subsequently, Mother employed caretakers[5] approximately 22 hours per week to watch the children and help with housework. (N.T., 10/1/04, p. 36.) By agreement of the parties, beginning May 21, 2003, Father increased his time with

---

4. Father's salary while working as a chiropractor was $700 per week. (N.T., 10/1/04, p. 170.) He currently earns $600 working for his brother. (N.T., 10/1/04, p. 167.)

5. Since the summer of 2003, Mother has had four different caretakers for the children. (N.T., 10/1/04, p. 35.)

the children such that he had all four children every Wednesday night and alternate weekends. (N.T., 7/7/04, pp. 19-20.) This was the arrangement in place at the time of our custody hearings. (N.T., 8/12/04, pp. 76-77.)

In the spring of 2003, the parties attempted to mediate their differences arising out of the separation. (N.T., 8/12/04, p. 17.) The mediation failed when no agreement could be reached on economic issues. (N.T., 8/12/04, p. 22.) On May 30, 2003, Mother filed for divorce and included a petition for custody. On November 7, 2003, after attending an unsuccessful custody conference before a custody conference officer, the parties filed a stipulation for a custody evaluation by Andrea Sywulak Ph.D.

Craig Weiss Ph.D., Dr. Sywulak's partner, was enlisted by Dr. Sywulak to conduct a joint evaluation, whereby each would cover different aspects of the evaluation.[6] The evaluation took place between December 2003 and March 2004, resulting in a joint report of findings and recommendations dated April 8, 2004. (Exhibit P-12.) The evaluators' recommendation was for the parties to share legal custody and for Mother to have primary physical custody of the children, subject to Father's partial physical custody on Wednesday nights and every other weekend. In essence, the evaluators recommended that the informal custody arrangement that developed after the parties separated, and that was in place at the time of the evaluation, be maintained. The evaluators offered this recommendation, despite the fact that the parties had spent at least equal time raising the children, and despite

---

6. There was no indication of record to indicate that Dr. Sywulak sought or received the agreement of the parties prior to enlisting the aid of Dr. Weiss.

the overwhelming positive results of this arrangement on the children.

As set forth in detail below, the record before us did not support many of the evaluators' significant factual findings upon which they based their recommendation. Moreover, in some instances, the evaluators made credibility determinations that differed from this court's assessment of credibility. As such, while we carefully considered the Sywulak/Weiss report and their testimony, we discounted the weight of their recommendation in reaching our determination of the best interests of the children.

The parties' divorce was finalized on January 29, 2004, (N.T., 7/7/04, p. 21) and on March 13, 2004, Mother married Mr. Hirschbuhl. (N.T., 10/1/04, p. 3.) As part of the parties' equitable distribution agreement that occurred in January 2004, Father agreed to move out of the marital home by April 1, 2004, and, on March 29, 2004, he moved into a three-bedroom townhouse in Doylestown owned by his sister. (N.T., 10/1/04, p. 153.) Father's sister also stays at the house on a limited basis and spends the remainder of her time with her fiance, with whom she has plans to buy a new home in the near future. Afterward, she will hold the townhouse as a rental property, which will allow Father to stay there indefinitely. (N.T., 12/3/04, pp. 253-54.)

The parties appeared before this court for hearings on a custodial arrangement that was in the best interests of the children on July 7, 2004, August 12, 2004, October 1, 2004, and December 3, 2004. As there was clear bilateral hostility between the parties, at the conclusion of the hearing on October 1, 2004, we entered an interim

order that they immediately commence co-parent counseling. (N.T., 10/1/04, p. 230.)

On December 8, 2004, after considering all of the evidence presented, we determined that it was in the best interests of the children for Mother and Father to share legal custody of the children and to divide physical custody of the children equally. Accordingly, we entered an order setting forth an arrangement that gave each parent physical custody of the children on an alternating weekly basis. Our order also required the parties to continue their co-parent counseling sessions. Mother has now appealed that order.

In her statement of matters complained of on appeal, Mother raises the following issues:

(A) The trial court erred by failing to give appropriate weight to the testimony of the two neutral custody evaluators.

(B) The trial court erred in awarding Father shared physical custody, given his and his families' overt hostility towards Mother.

(C) The trial court erred by awarding shared physical custody to the parties, given the minimal level of cooperation between the parties.

(D) The trial court erred by disregarding the express preferences of the children.

(E) The award of shared physical custody in the case sub judice was a result of a pronounced bias towards equal physical custody on the part of the trial court.

(F) The trial court erred by placing improper weight upon the testimony of appellee (Father), given his profound lack of credibility at trial.

(G) The child custody award issued by the trial court is not in the best interests of the children.

(H) The child custody award issued by the trial court is contrary to the weight of the evidence.

(I) The child custody award issued by the trial court is contrary to law.

These nine issues fall into two general categories. First, that we failed to give appropriate weight or consideration to certain evidence and therefore made a custody determination that was not in the best interests of the children, and, second, that we had an improper bias towards an equal physical custody order. We address both of these areas below.

## (1) *This Court Properly Evaluated the Evidence and Made a Custody Determination That Was in the Best Interests of the Children*

In any custody determination, our paramount consideration is the best interests of the children. *Myers v. DiDomenico,* 441 Pa. Super. 341, 657 A.2d 956 (1995). The "best interests" standard is decided on a case-by-case basis and considers all factors that legitimately have an effect upon the children's physical, intellectual, moral and spiritual well-being. *Arnold v. Arnold,* 847 A.2d 674 (Pa. Super. 2004). With regard to issues of credibility and weight of the evidence, such determinations are within the discretion of the trial court that presided over the hearings and viewed the witnesses firsthand. Thus, appellate courts must defer to the trial court on those issues. *Johns v. Cioci,* 865 A.2d 931 (Pa. Super. 2004).

At the inception of the hearings before this court, Mother asserted that it was in the best interests of the

children that she be granted primary physical custody of the children. Although substantial credible evidence established that during extended periods of time Father was the primary custodian, he did not request primary physical custody but rather asserted that the best interests of the children required an equal physical custodial arrangement.

While our decision to award equal physical custody to both parents was premised on numerous factors, perhaps the most consistent evidence throughout the course of the four days of hearings was that the four children were well-adjusted, relatively happy, active, intelligent children who benefited from the parenting of *both* Father and Mother. Thus, in determining the best interests of the children, we saw no reason why this arrangement should be drastically altered. Our determination that equal physical custody was in the best interests of the children was also based upon our factual findings that:

• The children love and respect each parent;

• Both Father and Mother have expended considerable effort, each in their own way, in raising the four children. While the parties lived together, Father spent at least 50 percent of the time, if not more, raising the children;

• Both Father and Mother have provided and will provide the children with a good home environment;

• Both Father and Mother have the job flexibility to spend a substantial amount of time with the children;

• Equal physical custody will permit the children to spend more time with both Father's and Mother's extended families;

• Equal physical custody would not cause any disruption in the children's lives, as the parties live relatively near to each other and the children would continue to attend the same private schools that they currently attend.[7]

In light of these findings, especially with regard to the quality of the adjustment of these children, we determined that the best interests of the children would be served by a custodial arrangement that gave Father and Mother equal time. This arrangement most closely matches the amount of time the parties spent with the children during the marriage, which allowed the children to assimilate the best qualities of both parents.

On appeal, Mother asserts that we erred in reaching our determination in that we failed to consider or give appropriate weight to certain evidence. Before addressing this claim in detail, we reiterate that issues of credibility and weight of the evidence are within the sole discretion of the trial court. *Johns v. Cioci, supra.*

Mother first asserts that we failed to give "appropriate weight" to the report and testimony of the two custody evaluators, who issued a joint recommendation that Mother have primary physical custody of the children. While we carefully considered this evidence, we exercised our discretion to assign it whatever weight we deemed appropriate. Accordingly, we chose to discount the weight of that evidence as several of the evaluators' recommendations were based on facts that were not sup-

7. The youngest child, Jeremy, attends the Montessori school. The older three children attend Newtown Friends School. The parties agreed to escrow a significant amount of money from the sale of the marital home to fund the tuition for this private schooling for the remainder of the children's education.

ported by the record. Moreover, other recommendations were based on credibility determinations that differed from this court's.

With respect to those factual findings, the evaluators' report at times was critical of both parents and at other times noted that both parents had bonded and loving relationships with the children. It included observations that Father "tended to be relatively emotionally reserved" (exhibit P-12, p. 6) and that he was "reportedly a bit more disconnected from the children." (Exhibit P-12, p. 8.) The evaluators summarized the factual basis for their recommendations as follows:

"Based on the information gathered and reviewed during the evaluation, it is evident that Jeremy, Luke, Arielle and Gabriel Haug have clearly bonded with both parents, as well as with Wayne Hirschbuhl, Mother's new husband. Although [Father] insists that [Mother] is suffering from emotional and psychological problems, it is these evaluators' opinion, within a reasonable degree of psychological certainty, that neither Mother, Father, nor Wayne Hirschbuhl are suffering from any emotional or psychological disorder. All are determined to be 'good enough' parents who take adequate care of the minor children. The children are very comfortable in both homes and with all the adults who were evaluated. While Mother and Father may have different parenting styles, the Haug children have sufficiently adjusted to both homes. It is also clear that [Father] and [Mother] do not co-parent well.

"While Mother has made some effort at co-parenting, it is clear that some of her correspondence and phone calls could accurately be perceived as negativistic and

attacking Father and those who support him. She may not always recognize this and may be surprised when she does not get the desired results. [Father], on the other hand, apparently has made little attempt at productive co-parenting. This is of concern to these evaluators. Also, [Father] has unclear plans for where he will be residing. He states he will be renting his sister's three-bedroom townhouse, and notes that he doesn't think she will be living there, but neither is certain. Mother has a permanent home. It is also apparent that, although the Haug children have bonded with both parents, Mother has essentially been the primary parent throughout their lives, and she currently is their primary psychological parent. Also, [Mother] works a part-time schedule, but Father is working full-time, even though he insists that there is flexibility in his schedule. Significantly, when asked who would care for the children during times he was working and Mother was not, he replied that he would have family or friends watch the children as opposed to Mother having them in her care. The current custody differences seem to stem more from marital differences than actual parenting difficulties. Moreover, matters are made worse by the fact that [Mother's] extended family has split and chosen sides, with her parents and at least one brother favoring [Father], while her sisters are mostly in her camp. There are other divisions among various family and friends on both sides, more so than is typically seen in other custody evaluations. This only serves to make matters more difficult for the minor children to feel comfortable in both households." (Exhibit P-12, p. 25.)

As stated above, the record before us did not support several of the key aspects of these findings. First, the evaluators found that Father was unclear and/or evasive

as to where he would be residing in the future.[8] At trial, however, Father testified that he was and would continue to be living in Doylestown in a three-bedroom townhouse that was owned by his sister. (N.T., 10/1/04, pp. 153-55.) Father's sister, a school teacher, testified that, while she currently still stays at the townhouse at least part of the time, she is moving out of that house permanently to live with her fiance. Father's sister credibly testified that she intends to keep the townhouse as a rental property and that Father may remain there indefinitely. (N.T., 12/3/04, pp. 253-54.)

The evaluators also concluded that Mother was the children's primary parent throughout their lives. This conclusion is completely contradicted by the record. At trial, it was clear that Father was responsible for at least 50 percent of the parenting during the majority of the children's lives while the parties were living together. The parties' work arrangement from 1993 to October 1996 was such that they alternated workdays to ensure that each parent spent equal time with the children. In October 1996, when Mother had her accident, Father's parental role increased beyond the 50 percent level. While Mother gradually recovered from her accident up through the time of separation, Father continued to have a very active role in the parenting of the children.

---

8. To a certain degree, that finding may have been related to the timing of the evaluation. The evaluators completed their evaluation in March 2004 and issued their report in early April 2004. In January 2004, the parties reached an agreement that required Father to be out of the marital residence by April 1, 2004. While Father moved out of the marital home in March 2004, the record was unclear as to when he made the decision to do so.

Mother herself acknowledged that from the time the children were born, Father was very active in the parenting of the children. (N.T., 10/1/04, pp. 191-92.) It was undisputed that Father changed the children's diapers, bathed the children, fed the children, shopped for the children, read with the children, cooked with and for the children, did chores with the children, participated in the children's education, transported the children to different activities, participated in the children's sporting events and other activities, took the children to medical appointments, talked to the children about sports, books, school, friends, and other topics, and otherwise tended to the children as a parent would. (N.T. 10/1/04, pp. 174-97.)

The children's maternal grandparents confirmed that Father was very involved in raising the children. Indeed, Mother's father referred to him as "Mr. Mom." (N.T., 10/1/04, pp. 72-73, 124.) The parties' housekeeper, Mother's aunt, Father's brother and Father's sister all offered testimony that confirmed the significant extent of Father's involvement in the parenting of the children. We also found Father's testimony that he shared in all parental responsibilities to be very credible. Given the volume and consistency of this testimony, the evaluators' observation that Mother was the primary parent while the parties were together is simply unfounded.

The evaluators also concluded that Mother has more flexibility in her schedule to be with the children than Father has in his schedule. This conclusion was also not supported by the custody hearing record.

Mother testified that she works approximately 10 to 15 hours per week and during that time has caretakers tend to the children. Father works for his brother's tree

servicing and landscape company, and testified that he has the ability to set his own schedule. (N.T., 10/1/04, p. 166.) As a salaried employee, Father can arrange his schedule such that he can work long hours one week and have the following week off from work without affecting his income. (N.T., 10/1/04, pp. 20, 166-67.) Ken Haug, Father's brother, employer, and former next door neighbor, corroborated Father's testimony regarding the flexibility of his schedule. (N.T., 12/3/04, p. 247.) Mother offered no evidence to refute any of this testimony. In light of this record, we concluded that Father has as much or more flexibility in his schedule than Mother.

The evaluators also found it significant that, when asked who would care for the children when he was working and Mother was not, Father replied that he would have family or friends watch the children as opposed to allowing Mother to have them in her care. (Exhibit P-12, p. 25.) However, the evaluators ignored that, when Mother works, she pays caretakers to watch the children rather than having them with Father. (N.T., 10/1/04, p. 39.) Under these circumstances, it is difficult to understand how the evaluators would criticize Father but not Mother.

At trial, both Dr. Sywulak and Dr. Weiss also opined that Father was emotionally detached from the children, and that he appeared overwhelmed when Dr. Sywulak observed him interacting with the children in the playroom in her office. (N.T., 8/12/04, pp. 170, 193, 200.) These observations regarding Father's connection and interaction with the children were based on a total of one and a half hours[9] of observation of Father and the chil-

---

9. Dr. Weiss spent no time evaluating the children. (N.T., 8/12/04, p. 191.) Dr. Sywulak observed Father and the children interact for half

dren interacting under somewhat artificial circumstances, where they were aware that they were being evaluated. (N.T., 8/12/04, p. 225.)

The overwhelming weight of the evidence at trial from witnesses that knew and interacted with the family in natural settings on a regular basis over many years refuted the evaluators' finding that Father was emotionally detached from the children. These witnesses consistently and credibly testified that Father and the children were emotionally connected and that Father was always there to tend to their needs, emotionally and otherwise. These witnesses included members of Father's family, and, more significantly, members of Mother's family, including those closest to her—her father (N.T., 10/1/04, p. 126), mother (N.T., 10/1/04, p. 73), and aunt. (N.T., 10/1/04, p. 214.) While we recognize that there was some hostility between Mother and her family, this hostility was in no way so pronounced that it would sway Mother's own family to falsely testify that Father was in fact emotionally connected with his children. The evidence of record of Father's connection to his children was too consistent and too strong to overcome this possible bias. Indeed, the parties' housekeeper during the marriage, an unbiased and credible witness, strongly contended that Father was connected to his children in every way. (N.T., 12/3/04, pp. 231-34.)

The parties also stipulated that this court should speak with the two oldest children, Gabriel (age 10) and Arielle (age 8). Both children expressed that they feel comfortable going to either parent for advice and that both par-

---

an hour in the playroom in her office and another hour at her home visit at Father's former residence. (N.T., 8/12/04, p. 225.)

ents give good advice. (N.T., 12/3/04, pp. 290, 300-301.) We viewed this as further evidence that Father is not distant and that he has an emotional connection with his children.

In light of all of the above testimony from various sources, including Mother's own family, and the amount of involvement Father had in raising his children, we concluded that Father was very much emotionally connected to his children despite the evaluators' conclusions to the contrary.

The evaluators also made credibility determinations regarding Mother and Father. In their report, the evaluators noted that: "it became obvious that [Father] tended to obfuscate when these evaluators tried to determine and ascertain important pieces of information. Moreover, [Father] often offered information which was in direct variance with itself. . . . Additionally, unless these evaluators asked questions in a very specific manner, he would refuse to give a straightforward answer." (Exhibit P-12, p. 10.)

Dr. Weiss confirmed that determination at trial when he testified that Mother was credible and that Father was not. (N.T., 8/12/04, p. 126.) In contrast, at trial we found that Father was a credible witness and that on many material issues his testimony was corroborated by one or more sources.

Mother asserts in her statement of matters complained of on appeal that we erred due to "Father's profound lack of credibility." The record before us simply does not support the proposition that Father's testimony lacked credibility, "profound" or otherwise. Indeed, our careful review of the record confirmed our initial conclusion that,

on matters relating to the best interests of the children, Father was more than credible.

In determining a custodial arrangement that was in the best interests of the children, we had to weigh the evaluators' recommendations and the reasons for those recommendations. We determined that the evaluators' recommendations were at least partly based on factual conclusions that were not supported by the record and credibility determinations that were different from our own. As such, we discounted the weight of their recommendations. The weight that we assigned them was entirely appropriate given the evidence of record.

Mother next argues that we erred in awarding equal physical custody, given Father's and Father's families' hostility towards Mother, and given the minimal level of cooperation between the parties. In fashioning our custody order, we were fully aware of the hostility between the parties, the hostility toward Mother from the extended families of both Father and Mother, and the general level of cooperation between them. We believe that Mother is at least equally to blame for this hostility.

In light of this situation, we determined that it was in the best interests of the children that Mother and Father work to reduce their level of hostility through co-parent counseling, rather than hope that it would resolve itself by awarding one parent primary physical custody and perhaps minimizing contact between the parties. Accordingly, we ordered the parties to participate in co-parent counseling even prior to the conclusion of the hearings and reiterated that directive in our December 8, 2004 order.

Mother next argues that we failed to consider the preferences of the children when awarding equal physical

custody. The weight to be accorded to a child's preference varies with the age, maturity and intelligence of that child, together with the reasons given for the preference. *Wheeler v. Mazur,* 793 A.2d 929 (Pa. Super. 2002). We considered the children's preferences in light of these factors when rendering our decision.

In this case, the parties stipulated that this court would only hear from the two oldest children, Gabriel and Arielle. This court interviewed both children in chambers in the presence of the counsel. The oldest child, Gabriel, was almost 11 years old at the time of our hearings. He expressed a preference for a custody arrangement in accordance with the post-separation arrangement that developed. This statement greatly differed from the wishes he originally expressed to the custody evaluators, wherein he desired to have more time with Father. (N.T., 12/3/04, p. 283.) The evaluators noted "Gabriel informed this evaluator that he would like to spend half of the time with his father, as he misses him." (Exhibit P-12, p. 22.)

When asked why he now wanted to maintain the post-separation arrangement, Gabriel expressed that the weekends with Father are hectic and that he enjoys quiet time that he has at Mother's residence, just relaxing with the immediate family. (N.T., 12/3/04, pp. 281-82.) However, when asked by this court, Gabriel agreed that, if he had quiet time with Father during the week, he would like that arrangement too, and that under those circumstances he would like to spend more time with Father. (N.T., 12/3/04, pp. 286-87.) We had that preference, among other considerations, in mind when we fashioned our order giving each parent alternating seven-day blocks of physical custodial time with the children.

We also interviewed Arielle, who was 8 years old at the time of our hearings. She expressed that she wanted to keep the present arrangement. When asked why, she hesitated and eventually stated that she liked living primarily with Mother because she liked Mr. Hirschbuhl's house and that Mr. Hirschbuhl was nice. She did not like that Father lived in a house that was part of a condominium development and thought that Father should get his own house. (N.T., 12/3/04, pp. 297-99.)

On December 8, 2004, we noted in open court that both parties provided homes that were appropriate environments to raise the children. (N.T., 12/8/04, p. 3.) Mother has not challenged that finding. To the contrary, she agreed that Father provides a comfortable home for the children. (N.T., 8/12/04, p. 91.) We also considered whether the materialistic opportunities provided by Mr. Hirschbuhl (*i.e.,* the pool, farmhouse, and horses) which Father could not provide weighed in Arielle's preference.

We gave careful consideration to Arielle's testimony. However, given her age and the reason for her preference for more time with Mother, we determined that her preference was greatly outweighed by the other factors set forth above, which indicated that the best interests of all four children would be served by an equally divided custodial arrangement.

Mother next argues that we erred by placing improper weight upon Father's testimony, which Mother concluded lacked credibility. Again, as the finder of fact, it is our province to determine credibility, not the adverse party. It is also clear that, on issues of credibility, the appellate courts should defer to the findings of the trial judge, who is in the unique position to evaluate the witnesses on a

firsthand basis, noting inflections of their voices and other nonverbal means of communication that are not reflected in the transcript. *Johns v. Cioci, supra.* After considering the testimony offered and the manner in which it was conveyed, we determined that Father was a credible witness.

*(2) Our Award of Equal Physical Custody*
*Was Based Upon the Best Interests*
*of the Children and Not a Bias Towards*
*Equal Physical Custody*

Lastly, Mother argues that our award of equal physical custody was based on a "pronounced bias" towards equal physical custody, rather than the facts of this case. Mother raises this claim only after we did not agree with her position that she should be primary custodian of the children. Indeed, at no time during these proceedings did Mother question the impartiality of this court or imply that we somehow harbored a bias towards equal physical custody. Nor did Mother request this court to recuse itself at any time for this or any other reason. As this issue was not raised at the trial court level, it is waived and cannot form the basis for appellate relief. Pa.R.A.P. 302(a).

Yet even if this argument was not waived, there is nothing in the record that supports Mother's contention that our ruling was the product of any bias. To the contrary, the record is clear that both Father and Mother have been good and nurturing parents who have raised well-adjusted children, and that the children love and respect their parents. The record is also clear that both Father and Mother have spent approximately equal amounts of time in parenting the children and that the children have emotional attachments to both parents. It was also clear that

both Father and Mother provide the children with good home environments and both have the flexibility to spend substantial amounts of time with the children. We also note that the children are only able to develop relationships with their extended family while they are with Father, and that increasing Father's custodial time to an equal custody arrangement will not have impact on the children's education. All of these factors influenced our decision to award equal physical custody. That decision was not the product of bias.

Thus, for all of the above reasons, we determined that our December 8, 2004 order was in the best interests of the children.