# Lehman v. Lehman

2

*Heather Lynne,* pro se.
*Alfred G. Lehman IV,* pro se.

FORD, *J.,* April 15, 2011—There are two minor children involved in this custody dispute, Savanna J. Lehman, who is 16 years old and Syndey E. Lehman, who is five years old. Plaintiff, Heather Lynne (mother), who recently changed her name from Heather Lehman, seeks to alter previous custody orders so that she is made the sole legal and physical custodian of Savanna. She also seeks an order of shared legal custody of Sydney with defendant, Alfred G. Lehman, IV (father). As to Sydney, mother wants to be named the primary physical custodian with partial custody rights in father.

Father asks that the shared physical custody arrangement that he had with mother for Sydney continue. Father agrees not to have physical contact with 16-year-old Savanna except when Savanna wants that contact. However, father asks that he continue to be designated as a joint legal custodian of Savanna.

Intervenor, Michael Sullivan (grandfather), requests an acknowledgment of his right to intervene in this custody case. He also asks to be named a legal and primary physical custodian of Savanna.

After a hearing conducted on March 9 and March 10, 2011, on various petitions of the parties, the court enters an order today granting mother exclusive legal and physical custody of Savanna. Savanna may have contact with father when Savanna agrees. Grandfather may visit Savanna at such times as grandfather and Savanna agree so long as it is not disruptive of Savanna's school schedule. As to Sydney, the court orders that the parents share legal custody of her. Mother is made the primary physical custodian with meaningful partial custody rights in father. (No provision is made for grandfather to have a relationship with Sydney in that there is no biological or other relationship recognized in law between grandfather and Sydney.)

In this opinion, I explain the reasons for the entry of today's order.

## PROCEDURAL HISTORY

The case began when mother filed a complaint for custody on January 4, 2010. That resulted in an agreed order on March 31, 2010. Mother filed a petition for modification on April 6, 2010. That resulted in an agreed order on May 17, 2010. Under these orders, the parents shared legal custody of the children. Father was given the right to custodial time with Savanna on those occasions when the parties agreed to it. The parents shared physical custody of Sydney with quite a number of changes between

the households each week. Shared physical custody has remained in place from the time of these agreed orders through the hearings just completed. For most of this time, the parents have alternated custody of Sydney each weekday and each weekend.

On May 28, 2010, father filed a petition for contempt against mother. This petition for contempt was one of the subjects of the hearing just completed. The petition is denied with today's order.

On November 16, 2010, grandfather filed a petition to intervene in this case. In it, he also sought partial physical custody of Savanna or guardianship of her. Grandfather followed that with the filing of a petition on March 10, 2011, the only petition now before me which was filed after the effective date of Pennsylvania's latest custody statute, 23 Pa.C.S. §§ 5321-5340. In the March 10 petition, grandfather sought shared legal and primary physical custody of Savanna. Grandfather's petitions were also subjects of the hearing just completed.

Another petition heard at the most recent hearing was mother's counterclaim for contempt against father which petition was filed on December 9, 2010.

Thus, the matters which I heard on March 9 and 10 were the two petitions for contempt (one by each parent) and grandfather's petitions for intervention and for custody. The three parties made it clear at the March hearing that they wanted the court to decide basic custody issues and arrangements for the children.

## FINDINGS OF FACT

1.    Savanna J. Lynne was born on August 17, 1994, to Heather Lynne, mother, and John Sullivan. Michael Sullivan (grandfather) is Savanna's paternal grandfather. Savanna is currently 16 years old and is a junior at Parkland High School in Lehigh County.

2.    Mother and John Sullivan were married but their marriage ended in divorce. Mother later married Alfred G. Lehman, IV, father. Mother and father separated on approximately November 9, 2009.

3.    John Sullivan relinquished Savanna for adoption. When Savanna was 11 years old, father adopted her.

4.    Sydney, who was born on May 20, 2005, is the natural child of mother and father. Sydney is five years old and currently attends kindergarten at Allentown's Jewish Community Center.

5.    Mother filed for divorce from father in April, 2010. That divorce action is still pending.

6.    Since their separation, mother and father have had periodic rendezvous, which have included sex, until as recently as September, 2010. The rendezvous have occurred despite provisions in orders from the Lehigh County Court of Common Pleas entered on October 4, 2010, in case numbers MD/2686 of 2010 and MD/2687 of 2010. These orders have provisions that father is to have no contact with mother. The orders stem from father's conviction for harassment of mother. Mother and father were aware of the no-contact provisions in the orders but willfully disregarded them.

7.    Both before and after their separation, mother and

father have had a stormy relationship. This has included furious arguments by both individuals, some of which have occurred in the presence of the children. It has included marijuana and cocaine use by father. It has included father spitting on mother and his directing obscene and crude language at her.

8. At a point approximately three months after the filing of this custody action, through agreed orders, mother and father shared legal custody of Sydney and alternated physical custody of Sydney every day. This changed to alternating physical custody of Sydney every weekday and alternating every weekend. The latter arrangement was still in effect at the time of the hearings just completed. Because of Savanna's reluctance to be with father, mother and father agreed, as reflected in the orders, that father would only have contact with Savanna when mother and father agreed. Father's last custodial time with Savanna was in November, 2009. Savanna wants no contact with father. One of the primary reasons is that she considers father to have been abusive to mother.

9. Mother currently resides at 1246 North 22nd Street, Allentown, Lehigh County. She has a nursing degree and various certifications pertaining to real estate. She currently works as a realtor. She works by appointment with clients, but she usually is in her office weekdays from 9 a.m. until 4:30 to 5:00 p.m.. Her employment requires that she travel for one five-day period each year and one two-day period each year.

10. Barbara Buck is the maternal grandmother of both children. She and mother have a close relationship.

Mrs. Buck occasionally watches the children. She was an appropriate caregiver for the limited occasions when she was asked to do this. Ms. Buck resides in Allentown. She and mother have indefinite plans to purchase a home together and reside together with the children when mother has custody of them.

11. Father, Alfred G. Lehman, IV, has resided at 316 Brookfield Circle, Macungie, Lehigh County, since December of 2010. This is a two-bedroom, loft apartment. He lives there with Maria McGraw, his girlfriend since July, 2010. (Ms. McGraw did not testify.) They have been living together since October, 2010. Ms. McGraw is pregnant by Mr. Lehman. Her expected delivery date is July 31, 2011. Sydney also lives at this Macungie address when father has custody of her. Since mother and father's separation, Sydney has been introduced to an earlier girlfriend of father and later to Ms. McGraw. Father works at MetLife, 4905 Tilghman Street, Allentown. He has securities licenses. He generally works from 9:00 a.m. to 5:00 p.m., weekdays. He meets with clients by appointment. He works some evenings.

12. Mr. Lehman's mother, identified at the hearing as Linda, was involved in an incident whereby she unintentionally caused a housefire with a smoldering cigarette. Two individuals died in that fire. It is presently unsafe for Sydney to be left in the exclusive supervision of Linda.

13. Despite the separation by mother and father since November, 2009, despite the court's no-contact order for father to stay away from mother and despite a pending

divorce proceeding, mother and father have had sexual relations on various occasions until September, 2010. Despite their divorce, mother has had sexual relations with John Sullivan at the home of grandfather when mother and John Sullivan visited there over Thanksgiving, 2010.

14. Grandfather, Michael Sullivan, resides in the western part of Pennsylvania in Murraysville, Westmoreland County. He lives there with his wife, Wanda Sullivan, whom he married on August 8, 2008. Also residing in that home are Mrs. Sullivan's son, the son's girlfriend, and their 4-month-old child.

15. Grandfather owns his own business. His work hours are flexible. Mrs. Sullivan is an assistant manager of a Verizon store. Both are available, as needed, for Savanna.

16. The tumultuous and inconsistent relationship between mother and father has adversely affected both children in that they have witnessed much of it. Savanna began rebelling against the rules spoken by mother. In the first half of 2010, Savanna began a relationship, which included sex, with a young man identified at the hearing as Matt. Mother put Savanna on birth control. There is a strong suspicion that Savanna used marijuana and alcohol in 2010 based upon admissions that she made to father. Without the permission of the parents, Savanna missed classes at Parkland High School in 2010. She has sneaked out of mother's residence on several occasions.

17. Before the summer of 2010, grandfather, Michael Sullivan, had an infrequent relationship with Savanna even though he wanted the contact to be more frequent. Mother

has always trusted grandfather. Out of frustration and an inability to fully control Savanna, mother requested of grandfather that he take Savanna with him to Murraysville for the summer of 2010. Grandfather agreed. Notice was given to father, who did not agree with Savanna's going to Murraysville. Savanna lived at the Sullivan home from June 20, 2010, through the end of August, 2010.

18. The Sullivans are good, principled people. They love Savanna. They provided a nourishing environment for her. They set rules for living in their home, which were explained to Savanna. With some minor exceptions which were properly addressed, Savanna complied with the rules of the home. Savanna held two jobs while living with grandfather. She excelled at both. Savanna and Mrs. Sullivan formed a warm relationship which included heart-to-heart discussions between the two of them. The discussions often involved morality issues including sexual abstinence. Here is Mrs. Sullivan's description of her chats with Savanna:

> I think that there's, there's a moral basis that, that's missing.... [I]n our talks ... I try to explain to Savanna about...saving herself, about being important, about, ... the gift that she gives is important. And she looked at me like a deer in the headlights. I have no idea what you're talking about. I, I would like to help to establish a basis for the rest of her life.

19. Because the summer went well, grandfather wanted Savanna to remain in Murraysville for her junior year of high school. Mother objected to that. Savanna was unsure whether she wanted to return to Lehigh County or remain

with grandfather. Mother investigated the possibility of Savanna's attending an out-of-state boarding school. Mother unreasonably expected grandfather to fund this education. Savanna returned to Allentown and to her junior year at Parkland High School.

20. Savanna has been on medication for unspecified mental health reasons. (There was no competent proof at hearing of mental health issues Savanna may have.) For the past three to four months, she has been engaged in talk therapy. She had an earlier course of talk therapy as well.

21. Savanna knows that mother wants Savanna to reside primarily with her and that grandfather wants Savanna to reside primarily with him. Savanna is unsure which is the better arrangement for her. Savanna's ambivalence about where to live stems from a variety of factors including her love for her mother, her love for the Sullivans, the good things that have happened in Murraysville, the good things that are happening in Allentown, and her concern about Sydney.

22. Because of her young age, the judge did not have the opportunity to meet Sydney. Sydney loves both of her parents. Despite that, there is some anxiety in Sydney that she displays when father's custodial periods with her are about to begin. Savanna has noticed this. The combination of Savanna's seeing this reaction in Sydney combined with the outbursts that Savanna has seen by father causes Savanna to be deeply concerned for Sydney's welfare. This creates a difficult sense of powerlessness in Savanna. Her wanting to protect Sydney from what she sees as

aggressive behavior by father adds to Savanna's difficulty in deciding where she wants to live.

23. Savanna is a beautiful, articulate, and personable young woman. Although she had the various difficulties in 2010, which were explained previously, good things have happened in her life in Lehigh County. She had difficulties with her grades at the beginning of this academic year. She made progress since that low point. She has competed in a cake decorating competition through school and has won at various levels of the competition. At the time of the hearing, she was continuing in that competition. Savanna has a circle of close, longstanding friends and seems to enjoy Parkland High School, which she has attended for each of her high school years.

24. Sydney is doing well academically in kindergarten; however, she misbehaves by hitting other students. The parents acknowledge that Sydney could benefit from therapy and they agreed Sydney should receive therapy from Maria at Cooper Psychological. Nevertheless, neither party has placed Sydney in therapy.

25. There are many beneficial events, activities, and conversations that mother has with both Sydney and Savanna. The same is true about the time that father spends with Sydney.

26. Father admitted the use of cocaine and marijuana in the past. He was not believable about when that usage stopped. There is a concern that he continues to use illegal drugs.

27. Mother has displayed flexibility in accommodating

father for reasonable requests for custody schedule changes. Father has not been flexible.

28. To the point of separation, both parents were fully involved in performing parental duties for Sydney. Since separation, the parties still share those parental duties with father's being less involved than he was before separation. From the time that father formed the parental relationship with Savanna until late 2009 when the parents' separation occurred, father assisted in the parental duties for Savanna. He has not performed any of those since his falling out with Savanna in late 2009.

29. At the point that Savanna and father had the falling out in late 2009, father advised Savanna that he loved her, that he will be present for her when she needs him, but that he will not force her into a continued relationship with him. Savanna has an intense dislike for father and wants no further contact with him.

30. Father wants the present custodial schedule in regard to Sydney to continue, namely, that custody of her be switched every weekday and that the parents alternate weekends. Mother wants to be named primary custodian with some weekday contact for father and alternate weekends for father with Sydney. Both parents agree that Savanna should not have contact with father until Savanna wants to have such contact.

31. The present shared custody arrangement is chaotic and unstable for Sydney based upon the almost daily transfer of Sydney between residences, Sydney's behavioral problems in school, the lack of therapy for Sydney, and, particularly, the unpredictable conduct of

the parents.

## DISCUSSION AND CONCLUSIONS OF LAW

The first issue I address is grandfather's petition for legal and physical custody of Savanna. Before addressing the merits of this petition, I must determine whether grandfather has standing to seek custody of his granddaughter.

According to 23 Pa.C.S. § 5314 (now 23 Pa.C.S. § 5326), a grandparent lacks standing to sue for custody "if the child has been adopted by a person other than a stepparent or grandparent. Any...rights granted pursuant to this section prior to the adoption of the child shall be automatically terminated upon such adoption."

Savanna was adopted by her then stepfather, Alfred Lehman. Thus, under 23 Pa.C.S. § 5314, grandfather is not precluded from filing his custody petition. See also *Rigler v. Treem*, 660 A.2d 111 (Pa. Super. 1995).

Because grandfather has standing to bring the present petition for legal and physical custody of Savanna, the next question is whether the circumstances exist for him to be granted custody.

The applicable Pennsylvania statute reads:

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

...

(3) A grandparent of the child who is not in loco

parentis to the child:

> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;

> (ii) who assumes or is willing to assume responsibility for the child; and

> (iii) when one of the following conditions is met:

>> (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

>> (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

>> (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home. 23 Pa.C.S. § 5324.

The comment of the Superior Court in *Martinez v. Baxter*, 725 A.2d 775 (Pa.Super.1999), about 23 Pa.C.S. § 5313 (the former version of 23 Pa.C.S. § 5324) is helpful. According to the Superior Court, the

[l]egislative intent in enacting [23 Pa.C.S. § 5313]

is obviously to provide a basis and procedure for grandparent to obtain physical and legal custody of a grandchild in the unfortunate circumstances confronting many grandparents today: when their own children or individuals in their children's households are abusive or neglectful to their grandchildren, whether due to alcohol or substance abuse or mental illnesses resulting in therefrom. *Martinez v. Baxter*, 725 A.2d at 778.

Grandfather meets the first requirement for custody under Section 5324. Although father objected to Savanna's spending the summer of 2010 with grandfather, grandfather's caring for Savanna this past summer was not only with the consent of mother, but also at her request.

As to the second requirement stated in Section 5324, grandfather has assumed responsibility for Savanna in the past and has demonstrated that he is capable of doing so in the future. Grandfather and his wife, Mrs. Sullivan, provided wonderful care for Savanna throughout the summer of 2010. They are willing to subordinate aspects of their comfort to provide proper guidance and nurturing for Savanna. Any child could only benefit from being in the care of Mr. and Mrs. Sullivan. Grandfather has genuine concern for Savanna. He loves Savanna and the feeling is mutual.

There is a third requirement for grandfather to be named the custodian of Savanna. Although there are three methods by which grandfather could meet the third requirement, only one of these is potentially applicable in the present case. Grandfather argued at the hearings, through his attorney, that he "deems it necessary to assume

responsibility for (Savanna) who is substantially at risk due to parental abuse, neglect, drug or alcohol abuse, or mental illness."

The evidence does not demonstrate that Savanna is at risk through any of these forms of parental misconduct or deficiencies. Despite poor example by mother on some occasions and mother's frustration with Savanna, mother has never abused or neglected Savanna. There is no hint that mother abuses drugs or alcohol. There is no evidence that mother suffers from mental illness. Thus, grandfather is not entitled to legal or physical custody of Savanna.

With grandfather's ineligibility to be primary custodian of Savanna, it is proper that Savanna be in the exclusive custody of mother. Mother and father have agreed to this. The agreement is appropriate. Mother clearly loves Savanna and wants what is best for her. Savanna loves mother. Savanna feels safe in mother's home and she is comfortable there. She enjoys many of her interactions with mother.

Realistically speaking, mother must have sole legal custody of Savanna. Savanna has little to no respect for father. She does not want father involved in her life at all. Savanna has reached this point based upon bad acts by father that Savanna personally witnessed. Further, the relationship between mother and father is fraught with problems. That mother receives sole legal custody does not mean that mother should not keep father informed of Savanna's progress and significant events in her life. Mother must do this.

There is another significant reason that Savanna should

remain with mother and it is Sydney. There is a strong policy in law that, in the absence of compelling reasons to the contrary, siblings should be raised together whenever possible. *Johns v. Cioci*, 865 A.2d 931, 942 (Pa.Super. 2004); *Cyran v. Cyran*, 566 A.2d 878, 880 (Pa. Super. 1989). Although Savanna and Sydney have the typical ups and downs of siblings, Savanna loves Sydney, is devoted to her, and is protective of her. Both children would suffer if they were separated over an extended period.

Unfortunately, Sydney has also been subjected to the antics between mother and father. Savanna described the entire situation as "chaotic." Substantially contributing to the lack of organization in Sydney's life is the disruptive weekday custodial schedule for Sydney. She switches between the residences of the parents almost every day. With today's order, the court eliminates an element of what has been at times an unsettled life for Sydney. With mother's being made primary custodian, and father's being given significant partial custody, Sydney will benefit substantially from this far less hectic schedule.