J-A29041-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.L.-S., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| B.S., | : | |
| | : | |
| Appellee | : | No. 532 WDA 2016 |

Appeal from the Order entered March 10, 2016
in the Court of Common Pleas of Lawrence County,
Family Court Division, No(s): Case No. 10487 of 2014, C.A.

BEFORE:  DUBOW, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 13, 2017**

A.L.-S. ("Mother") appeals from the Order (hereinafter "the Custody Order") that awarded B.S. ("Father") sole legal custody of the parties' two minor sons, W.S. ("W.") and C.S. ("C.") (collectively "the Children"), awarded Father primary physical custody of C., and granted the parties shared physical custody of W.  We affirm.

The trial court thoroughly set forth, in its Memorandum accompanying the Custody Order (hereinafter "Custody Order Memorandum"), the factual and procedural history underlying this appeal, which we adopt as though fully set forth herein.  **See** Custody Order Memorandum, 3/23/16, at 1-14.[1]

_____

[1] We additionally note that prior to the custody trial in this matter, on July 14, 2015, Mother filed a Motion to compel Father to undergo a psychological examination (hereinafter "Motion for Psychological Exam"), asserting Mother's belief that Father has an undiagnosed mental health condition. After hearing oral argument from the parties, the trial court denied the Motion.

Following the protracted custody trial, and upon consideration of the parties' respective Petitions for modification of custody, the trial court entered the Custody Order on March 10, 2016. Mother timely filed a Notice of Appeal, along with a Pa.R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal. Subsequently, Father filed with this Court a Motion to Dismiss the appeal, asserting that Mother had committed several violations of the Rules of Appellate Procedure.

Mother presents the following issues for our review:

I.   Whether the trial court abused its discretion and committed reversible error by awarding [Father] primary physical custody of …C.[], as the evidence demonstrates the best interest and permanent welfare of … C.[] would be served by awarding [Mother] primary physical custody[,] subject to the partial custody rights of [Father]?

II.  Whether the trial court abused its discretion and committed reversible error by awarding [Father] sole legal custody of … [the Children], as the evidence demonstrates the best interest and permanent welfare of the [] [C]hildren would be served by awarding [Mother] sole legal custody of the [C]hildren, or at least shared legal custody?

III. [Whether the] trial court [committed] reversible error by issuing an [O]rder that divides the [C]hildren and causes substantial time apart[,] as there was no evidence of record supporting that such an arrangement was in the best interest and permanent welfare of the [C]hildren?

IV.  Whether the trial court abused its discretion and committed reversible error by denying [Mother's] Motion for Psychological [Exam,] while authorizing [Father] to present testimony from Dr. Jennifer Rosenberg ["Dr. Rosenberg"] regarding a mental health evaluation she performed on [Mother] several years prior to the trial?

V.   Whether the trial court committed reversible error by refusing to access the Our Family Wizard website, a court[-]

ordered communication medium, and perform a complete review of the communications between the parties?

VI. Whether the trial court committed reversible error by improperly relied [*sic*] on hearsay information contained within medical reports?

VII. Whether the trial court abused its discretion and committed reversible error by relying on inadmissible evidence when it declared [that Mother] has a proclivity for making regular unfounded referrals to Children and Youth Services ["CYS,"] when it had already ruled that the disclosure of the reporting party was prohibited by statute[?]

VIII. Whether the trial court committed reversible error by relying upon the Report and Recommendations of the Guardian *Ad Litem*[,] as the Guardian *Ad Litem* failed to conduct a full and thorough investigation to fully and adequately address the needs and best interest of the [C]hildren[,] and the Report and Recommendations contains recommendations from the Guardian *Ad Litem* on subjects which he is unqualified and inexperienced to make and, further, he failed to employ or secure the services of a qualified expert to address the issues at hand?

Brief for Appellant at 5-6 (issues renumbered for ease of disposition).

As a prefatory matter, we must address Father's Motion to Dismiss. Father asks us to quash Mother's appeal, urging that "the sheer volume and combined nature of Mother's violations [of the Rules of Appellate Procedure] make effective appellate review impossible." Motion to Dismiss, 7/5/16, at ¶ 8. Specifically, Father complains that Mother has not filed a designation of contents of the reproduced record, in violation of Pa.R.A.P. 2154(c)(1). Father contends that the lack of a designation of reproduced record prejudiced him by denying him the opportunity to designate additional parts of the record not designated by Mother. Motion to Dismiss, 7/5/16, at ¶ 14.

Father also complains that Mother's reproduced record omits numerous relevant record documents/information, including docket entries, portions of the trial transcript, and pertinent trial exhibits that Mother references in her brief. *Id.* at ¶¶ 20-36. Finally, Father points out that Mother's reproduced record lacks pagination and a table of contents. *Id.* at ¶¶ 37-41; *see also* Pa.R.A.P. 2173, 2174.

Contrary to Father's assertion, we determine that Mother's infractions of the Rules of Appellate Procedure are comparatively minor, and do not unduly prejudice Father or impede our review of the issues presented on appeal. Our Pennsylvania Supreme Court has stated that the "extreme action of dismissal should be imposed by an appellate court sparingly, and clearly would be inappropriate when there has been substantial compliance with the rules and when the moving party has suffered no prejudice." *Stout v. Universal Underwriters Ins. Co.*, 421 A.2d 1047, 1049 (Pa. 1980). Accordingly, we decline to dismiss the appeal, and deny Father's Motion to Dismiss. *See*, *e.g.*, *Hagel v. United Lawn Mower Sales & Serv.*, 653 A.2d 17, 19 (Pa. Super. 1995) (declining to quash the appeal, or impose other sanctions, where the appellant failed to designate or file a reproduced record, but the violations of the Rules of Appellate Procedure were not so serious as to preclude the Court's ability to properly evaluate and address the substantive arguments advanced by the parties); *Downey v. Downey*, 582 A.2d 674, 678 (Pa. Super. 1990) (declining to dismiss the appeal because of appellant's failure to serve the appellees with a copy of the

designated reproduced record, and noting that "Pa.R.A.P. 2156 expressly permits an appellee to file his own supplemental reproduced record with the court when the parties are unable to cooperate on the preparation of the reproduced record.").

This Court's standard and scope of review of custody orders is as follows:

> The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citation, ellipses and brackets omitted). Additionally, we have explained that

> [o]n issues of credibility and weight of the evidence, we defer to the findings of the trial court[,] who has had the opportunity to observe the proceedings and demeanor of the witnesses. The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion. The test is whether the evidence of record supports the trial court's conclusions.

*Id.* (citations, paragraph breaks and brackets omitted); *see also Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (stating that "[t]he discretion that a trial court employs in custody matters should be accorded

- 5 -

the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.") (citation omitted).

When a trial court orders a form of custody, the paramount consideration is the best interest of the child. ***W.C.F. v. M.G.***, 115 A.3d 323, 326 (Pa. Super. 2015). In assessing the child's best interest, the trial court must consider the seventeen custody factors set forth in 23 Pa.C.S.A. § 5328(a) (hereinafter "the best interest factors"). ***W.C.F.***, 115 A.3d at 326; ***see also J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (stating that all of the best interest factors must be considered by the trial court when entering a custody order).

We will address Mother's first two issues simultaneously, as they are related. In her first issue, Mother argues that the trial court abused its discretion by awarding Father primary physical custody of C. ***See*** Brief for Appellant at 17-33.[2] Essentially, Mother challenges the trial court's findings and weighing of the evidence in several regards, and asserts that the court, in its Custody Order Memorandum, mischaracterized the evidence and disregarded relevant evidence favorable to Mother. ***See id.*** Mother places heavy emphasis on the trial court's having purportedly ignored Father's

---

[2] As Mother's Argument in support of this issue spans 17 pages, we will not set forth herein each of her myriad contentions.

- 6 -

inadequate and infrequent communication with Mother on important matters (concerning the Children's education, doctors' appointments, and extracurricular activities), which, she claims, interfered with her custodial rights. *Id.* at 23-25.

In her second issue, Mother argues that the trial court abused its discretion by awarding Father sole legal custody of the Children, where the evidence indicates that she is the party more likely to act in the Children's best interests. *See id.* at 33-40. According to Mother, the trial court improperly overlooked (1) Father's failure to obtain important medical treatment for the Children; (2) Father's lack of adequate supervision/care for W., which resulted in injuries to W.; and (3) Mother's superior efforts to ensure that W. is receiving proper education/therapy. *See id.* at 33-38.

In the Custody Order Memorandum, the trial court thoroughly addressed the best interests of the Children, including a comprehensive analysis of the best interest factors, and determined that it was appropriate to award Father sole legal custody of the Children, and primary physical custody of C. *See* Custody Order Memorandum, 3/23/16, at 15-27. Our review reveals ample support in the record for the trial court's cogent analysis, and the court's consideration of the Children's best interests was careful and thorough. *See A.V., supra* (stating that "[a]ppellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion."). Mother essentially asks this Court to disturb the trial

court's findings and weighing of the evidence, in favor of the findings and inferences that Mother proposes. This we cannot do. **See id.**; **see also M.J.M. v. M.L.G.**, 63 A.3d 331, 337 (Pa. Super. 2013) (rejecting appellant/mother's argument asking this Court to reconsider the trial court's findings and credibility determinations with regard to the best interest factors). Accordingly, as we discern no abuse of discretion, we affirm with regard to Mother's first two issues based on the trial court's rationale. **See** Custody Order Memorandum, 3/23/16, at 15-27.

In her third issue, Mother contends that the custody Order "divides the [C]hildren and causes substantial time apart[, and] there was no evidence of record supporting that such an arrangement was in the best interest … of the [C]hildren." Brief for Appellant at 45; **see also id.** at 46 (explaining that, under the custody schedule, the Children will spend approximately ten days per month apart). Mother points to this Court's decision in **Johns v. Cioci**, 865 A.2d 931 (Pa. Super. 2004), wherein we observed that "the policy in Pennsylvania is to permit siblings to be raised together, whenever possible …. Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development." **Id.** at 942 (citations and quotation marks omitted); **see also** 23 Pa.C.S.A. § 5328(a)(6) (requiring a court to consider the child's sibling relationships when ordering a form of custody); Brief for Appellant at 46.

Here, the trial court addressed Mother's claim in its Custody Order Memorandum, stating that it had, in fact, considered the policy articulated in **Johns**, but determined that the award of physical custody entered was in the respective, and different, best interests of the Children. **See** Custody Order Memorandum, 3/23/16, at 25-26. The trial court was free to form this conclusion in evaluating the Children's best interests, and we discern no abuse of discretion. Therefore, we affirm on this basis in rejecting Mother's third issue, **see id.**, with the following addendum. The **Johns** Court explained that the policy against separation of siblings is only one factor – and not a controlling factor – in the ultimate custody decision, wherein the best interests of each individual child is paramount. **Johns**, 865 A.2d at 942; **see also M.J.M.**, 63 A.3d at 339 (stating that "[i]t is within the trial court's purview as the finder of fact to determine which factors are most

salient and critical in each particular case.") (citation omitted).[3]

In her fourth issue, Mother asserts that

the trial court committed reversible error by (a) denying [Mother's Motion for Psychological Exam] of [Father;] (b) after denying [Mother's Motion] …, allowing [Father] to present testimony [at the custody trial concerning Mother's mental health diagnosis] from Dr. [] Rosenberg; and (c) relying on the testimony of Dr. Rosenberg when evaluating [Mother's] mental health status.

Brief for Appellant at 16-17. Mother points out that the trial court permitted Dr. Rosenberg to testify, over Mother's objection, that, approximately four years earlier (in connection with the Ohio proceedings), she had diagnosed Mother with Narcissistic Personality Disorder. *Id.* at 15; *see also id.* (asserting that Dr. Rosenberg's diagnosis of Mother was "stale" for being four years old). According to Mother, "the trial court deemed Dr. Rosenberg credible and used that information in [the court's] determination concerning

---

[3] Moreover, in the prior custody proceedings in Ohio, presided over by the Honorable Diane M. Palos ("Judge Palos") in the Cuyahoga County Court of Common Pleas (hereinafter "the Ohio proceedings"), Judge Palos stated as follows concerning the policy articulated in *Johns*:

The [c]ourt finds that although[,] traditionally[,] siblings learn from each other and have a positive impact by being together, in this matter there would be a greater positive impact on C.[] should he have more alone time with each parent[,] so that his or her attention could be focused on him and not on W.[,] when he is present. In addition, while [C.] should have some time with W.[] so that they continue to bond as brothers and learn from each other, C.[] should not have to live under the shadow of the extensive and significant restrictions and care involved in W.[]'s life.

Plaintiff's Exhibit 14 (Judge Palos's November 1, 2013 Findings of Fact/Order), at 7.

- 10 -

the [best interest] factor [at] 23 Pa.C.S.A. 5328(a)(15)[,]" *i.e.*, "the mental and physical condition of a party or member of a party's household." ***Id.*** Mother asserts that

> not only did [the trial court's] ruling place [Father] in a superior position and allow him to present testimony on this issue[,] while effectively barring [Mother] from having the opportunity to present similar testimony, it also prevented the trial court from completing a full best interest analysis. Given the special needs of W.[,] and the great deal of care that must be constantly provided to this non-verbal child …, the mental health of the parties is crucial to the best interest analysis.

***Id.*** at 16.

Pursuant to Pa.R.C.P. 1915.8(a), the court in a custody case "*may* order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts." ***Id.*** (emphasis added); ***see also Jordan v. Jackson***, 876 A.2d 443, 455 (Pa. Super. 2005) (interpreting Rule 1915.8(a) and stating that "[i]t is clearly within the court's discretion whether to order an evaluation.").

Concerning Mother's challenge to the trial court's admission of Dr. Rosenberg's testimony, we are mindful that "the admission or exclusion of evidence is within the sound discretion of the trial court. In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." ***R.K.J. v. S.P.K.***, 77 A.3d 33, 41 (Pa. Super. 2013) (citations and quotations omitted).

Here, in its Pa.R.A.P. 1925(a) Opinion, the trial court opined that

- 11 -

> insufficient reason was presented to justify a mandate that the parties undergo new psychological evaluations[,] with the accompanying expense, especially in view of the relatively recent completion of the comprehensive and extensive custody proceedings held in Ohio that resulted in the entry of the November 1, 2013 Order by Judge … Palos  ….

Trial Court Opinion, 5/9/16, at 1-2 (unnumbered).[4]  We are persuaded by the trial court's reasoning, and determine that the court properly exercised its broad discretion in denying Mother's Motion for Psychological Exam.  **See, e.g., Jordan**, 876 A.2d at 455 (holding that the trial court properly exercised its discretion in refusing a party's request for the court to order the mother to undergo a psychological examination prior to the custody hearing).  Merely because Mother had previously been diagnosed with a mental health disorder, in connection with the Ohio proceedings, does not, therefore, mean that the trial court in the instant case was required to compel Father to undergo a psychological examination.

Concerning Mother's challenge to the trial court's admission of Dr. Rosenberg's testimony regarding Mother's diagnosis of Narcissistic Personality Disorder, we discern no abuse of discretion.  **See R.K.J., supra**. At the custody trial, the trial court considered extensive argument from the parties' respective counsel regarding the admissibility of this evidence, and

---

[4] Judge Palos presided over a five-day custody trial, after which she issued exhaustive findings of fact in support of her custody Order.  **See** Plaintiff's Exhibit 14 (Judge Palos's November 1, 2013 Findings of Fact/Order), at 1-13.  Therein, Judge Palos addressed, *inter alia*, the mental health of Father and Mother, and determined that "while [] [M]other has alleged that [Father] has taken some mental health medications, his mental health has not been called into question in this matter."  *Id.* at 8.

- 12 -

determined that it was admissible. *See* N.T., 1/5/16, at 4-23. Moreover, the trial court did not preclude Mother from cross-examining Dr. Rosenberg or presenting Mother's own evidence concerning her mental health.[5] Additionally, in the Custody Order Memorandum, the trial court did not expressly state that Mother's diagnosis (or Dr. Rosenberg's testimony in general) weighed against Mother under the best interest factor at section 5328(a)(15); rather, the court merely noted the diagnosis. Custody Order Memorandum, 3/23/16, at 23. Finally, even if, *arguendo*, we agreed with Mother's characterization of Dr. Rosenberg's diagnosis as being "stale," this goes to the weight to be accorded that Dr. Rosenberg's testimony, which is within the sole purview of the fact-finder. *See A.V.*, *supra*. Accordingly, Mother's fourth issue does not entitle her to relief.

In her fifth issue, Mother contends that the trial court improperly refused to review all of the parties' email communications and schedule entries made via the "Our Family Wizard" website ("OFW"), a court-ordered communications and scheduling platform to which the trial court was granted access. *See* Brief for Appellant at 40-42. According to Mother, "[t]he entirety of the information contained within [OFW] … is vital[,] as it demonstrates [that Father] completely failed to properly utilize [OFW] to post the [C]hildren's scheduled medical and dental appointments[,] along

---

[5] We further observe that Father introduced Dr. Rosenberg's testimony, in part, to rebut Mother's trial testimony that she had never been diagnosed with a mental health disorder. *See* N.T., 12/14/15, at 132-35; *see also* N.T., 1/5/16, at 23 (wherein the trial court ruled that Dr. Rosenberg's testimony would be admissible, in part, to impeach Mother's credibility).

with the schedule of their extracurricular activities." *Id.* at 40-41; *see also*

*id.* (urging that "[Father's] failure to provide the aforementioned critical

information to [Mother] on [OFW] was a primary focus of the custody trial in

this matter.").

The trial court addressed this claim in its Pa.R.A.P. 1925(a) Opinion as

follows:

> Although [Mother] claims that the trial court refused to access
> the [OFW] website and review **all** of the communications
> between the parties …,[6] it is counsel's and the parties'
> responsibility to present evidence that they consider relevant,
> and to refer the court to those communications deemed
> important, with opportunity for opposing counsel to object to any
> communications believed to be objectionable and inadmissible.
> It is not the court's obligation to review the parties'
> communications to ferret out those parts of the exchanges that
> might be relevant and material.

Trial Court Opinion, 5/9/16, at 2 (unnumbered; footnote and emphasis

added). We are persuaded by the trial court's rationale and, discerning no

abuse of discretion, affirm on this basis in rejecting Mother's fifth issue. *See*

*id.*

In her sixth issue, Mother argues that the trial court committed

reversible error by relying on inadmissible hearsay evidence contained within

---

[6] It is undisputed that the parties had exchanged a large number of emails
via OFW. *See* Brief for Appellant at 41 (wherein Mother concedes that "the
communications between the parties are so numerous that it would have
been incredibly burdensome to present all of the relevant communications
during the trial"); *see also* Brief for Appellee at 24 (asserting that there
were 3,000 OFW emails). Additionally, the record reveals that at trial, the
trial court, in fact, admitted into evidence 42 OFW exhibits, which included
numerous email exchanges between the parties.

the Children's medical records. *See* Brief for Appellant at 42-43. Specifically, Mother avers that,

> [a]t trial, neither party presented the testimony of the [C]hildren's physicians or pediatricians … concerning the [C]hildren's medical records. However, the trial court clearly relied upon the information contained within those medical records for the truth of the matter asserted[,] as the trial court stated, in its [Custody Order] Memorandum …, that [Mother] urged the emergency room physician to make a referral to the Children's Advocacy Center ….

*Id.* at 43.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c); *In re K.A.T.*, 69 A.3d 691, 702 (Pa. Super. 2013). "Hearsay is not admissible except as provided by these rules [the Rules of Evidence], other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Initially, as the trial court correctly observes in its Pa.R.A.P. 1925(a) Opinion, "[Mother] alleges that the [trial c]ourt relied on inadmissible hearsay in medical reports …, but does not identify the medical reports or objectionable hearsay." Trial Court Opinion, 5/9/16, at 2 (unnumbered); *see also id.* (stating that "[a]fter review of the [trial c]ourt's [Custody Order] Memorandum, it is assumed that [Mother] is referring to page 12 of the Memorandum[,] where the [c]ourt made reference to the comment in the Akron Children's Hospital record[,] identified at trial as Exhibit 'H.'"). Even if, *arguendo*, we determined that the trial court erroneously referred to

certain hearsay statements, this would not warrant a reversal of the Custody Order, for, as the trial court correctly determined, any such error was harmless and did not contribute to the trial court's decision.[7] ***See id.***; ***see also Harman ex rel. Harman v. Borah***, 756 A.2d 1116, 1122 (Pa. 2000) (recognizing that not all trial errors constitute reversible error; rather, the complaining party must demonstrate that an error was harmful before a new trial may be awarded); ***In re M.T.***, 607 A.2d 271, 281 (Pa. Super. 1992) (holding that admission of hearsay statements of children was harmless error where the statements could not have contributed to the trial court's decision). Accordingly, Mother is not entitled to relief on this issue.

In her seventh issue, Mother contends that the trial court erred by "relying on inadmissible evidence when it declared [that Mother] has a proclivity for making regular unfounded referrals to [CYS.]" Brief for Appellant at 43. Mother asserts that "[e]ven though the trial court properly determined that disclosing the identity of the reporting individuals and/or agencies was prohibited by statute, the trial court committed reversible error by repeatedly attributing those reports to [Mother,] and utilizing those reports in its analysis for entering its [Custody O]rder …." ***Id.*** at 45.

The trial court addressed this claim in its Pa.R.A.P. 1925(a) Opinion as follows:

---

[7] The trial court explained that "[t]he reference was intended only as illustrative of the uncertainty as to the number of fractures [in W.'s foot], and in no manner was a factor in the [c]ourt's decision and establishment of the custody arrangement contained in [the Custody] Order." Trial Court Opinion, 5/9/16, at 2 (unnumbered).

- 16 -

> The basis for the trial court's comment on [Mother's] proclivity for making unfounded referrals … was the evidence of [Mother's] urging of a report to children's services when she took W[.] to the emergency room at Children's Hospital for examination in October[] 2014; [Mother's] transport of C[.] to the Pennsylvania State Police on June 6, 2015, and then [a] subsequent visit to the Children's Advocacy Center; and [Mother's] transport of C[.] to Jameson Hospital and referral to the Children's Advocacy Center on or about December 17, 2015. The trial court is not aware of the identity of referral sources that might be recorded in [CYS] records and reports.

Trial Court Opinion, 5/9/16, at 2-3 (unnumbered). Upon review, we discern no reversible error by the trial court in this regard. At no point did the trial court state a belief that Mother was the source of the reports. Rather, the court merely commented upon the admissible evidence, and the reasonable inferences to be drawn therefrom, which it was entitled to consider in addressing the best interests of the Children. Moreover, as Mother concedes, the trial court ruled that the evidence of the source reporter in CYS records was inadmissible. Accordingly, this issue does not entitle Mother to relief.

In her eighth and final issue, Mother argues that the trial court erred by relying on the Report and Recommendations ("GAL Report") issued by the court-appointed Guardian *ad litem*, Ryan C. Long, Esquire (hereinafter "the Guardian").[8] **See** Brief for Appellant at 47-52. According to Mother, the Guardian, a layperson, was permitted to issue unqualified opinions and recommendations that "require specialized knowledge, education and skill in

---

[8] We observe that Mother was the party who initially sought the appointment of a Guardian *ad litem*.

- 17 -

the area of psychology or child development[.]" *Id.* at 50. Additionally, Mother complains that "the vast majority of [the GAL Report] focused on an analysis of the [best interest] factors[,] and [the Guardian] provided his opinion as to the ultimate issues concerning the custody arrangement he believed was proper, which was solely within the purview of the [trial c]ourt …." *Id.* at 51; *see also id.* at 52 (wherein Mother asserts that the "recommendations" section of the GAL Report "should have been stricken by the trial [court,] as it contained opinions of a lay witness on the ultimate issue before the [c]ourt and is based upon hearsay statements of individuals who did not testify at trial.").

The statute concerning the appointment of guardians *ad litem* in custody matters, 23 Pa.C.S.A. § 5334, provides that a trial court may, on its own motion or the motion of a party, appoint a guardian *ad litem* to represent the child in the action. *Id.* § 5334(a). Section 5334 requires and authorizes a guardian *ad litem* to, *inter alia*, meet with the child, conduct further investigation, interview potential witnesses, and make recommendations to the court. *Id.* § 5334(b); *see also L.M.P. v. E.C.*, 2016 PA Super 232, *5 (Pa. Super. 2016). However, this Court has observed that a guardian *ad litem* is not a judicial or quasi-judicial officer, and a trial court may not delegate its judicial power to a guardian *ad litem*. *C.W. v. K.A.W.*, 774 A.2d 745, 749-50 (Pa. Super. 2001).

The trial court addressed Mother's claim in its Pa.R.A.P. 1925(a) Opinion as follows:

- 18 -

> The Guardian's [GAL] Report and testimony documented his extensive and thorough investigation[, which] exceeded that which routinely is performed in custody cases. The Guardian related his experience in custody litigation, his knowledge of the applicable principles and factors to be applied in custody litigation, and familiarity with the factual issues. The Guardian performed his mission professionally, based his findings and opinions on the results of his efforts, and expressed his recommendations in accordance with his duty to present the result that, in his opinion, would be most likely to serve the [C]hildren's best interests. The trial court does not perceive error in its consideration of his recommendations.

Trial Court Opinion, 5/9/16, at 3 (unnumbered). The record supports the trial court's determination. Contrary to Mother's assertion, the trial court did not merely substitute the Guardian's judgment for its own, as the court issued thorough, independent reasoning concerning the best interest factors. *See*, *e.g.*, *Yates v. Yates*, 963 A.2d 535, 541 (Pa. Super. 2008) (rejecting the father's claim that the trial court improperly delegated its judicial decision-making authority to a court-appointed parenting coordinator); *cf.* *C.W.*, 774 A.2d at 749-50 (holding that the trial court erred in delegating its judicial powers to the guardian *ad litem*, stating that "[t]hroughout the custody proceedings, the trial court repeatedly asked the guardian *ad litem* his opinion on evidentiary rulings and followed his opinions," and the court's custody order "closely followed the recommendations of the guardian *ad litem*[.]"). Finally, to the extent Mother complains that the GAL Report contained inadmissible hearsay information,[9] we discern no support for this claim.

---

[9] Mother fails to identify the purported hearsay statements.

- 19 -

Order affirmed.  Motion to Dismiss denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2017

# IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY PENNSYLVANIA

| | | |
|---|---|---|
| A███ L█████-S█████████,<br>Plaintiff | )<br>)<br>) | |
| v. | )<br>) | No. 10487 of 2014, C.A. |
| B████ S████████,<br>Defendant | )<br>)<br>) | |

MEMORANDUM TO ACCOMPANY THE COURT'S MARCH 10, 2016 ORDER

Fike, S.J.                                                                                       March 23, 2016

Before the Court are a Petition to Modify Custody filed by Plaintiff, A███ L█████-S█████ ("Mother"), and a Counter-Petition for Modification of Custody filed by Defendant, B███ S█████ ("Father"). The subjects of the proceedings are the parties' two sons—W████ S█████, born January 15, 2007, and C█████ S█████, born June 2, 2008.

Prior to initiation of the instant litigation in Lawrence County, Pennsylvania, custody of the children had been the subject of litigation in the state of Ohio. In 2012, the parties had entered into an agreed-upon Shared Parenting Plan that was approved by the Ohio Court then having jurisdiction. However, shortly thereafter, dispute arose between the parties that resulted in the filing of various petitions and motions, and ultimately in a five-day custody trial before Judge Diane M. Palos of the Cuyahoga County, Ohio, Court

1

of Common Pleas. Judge Palos decided the outstanding custody issues by a November 1, 2013 Opinion and Order directing, *inter alia,* (1) that the parties would share custody of W████ on an alternating weekly basis, with the exchange to take place on Mondays, either at school, or, if no school, at 8:00 a.m., with the relinquishing parent to return the child to the other parent's residence; (2) that Father would have custody of C████ for a period of two weeks, then Mother would have custody for one week, with the schedule then repeating so that Father would have C████ two weeks out of every three, and with the exchange to take place on Wednesdays, either at school or summer camp, or if no school or summer camp, at 8:00 a.m., with the relinquishing parent to return the child to the other parent's residence; (3) that, on any Monday or Thursday during the time that Father had custody of both children, Mother would have the option of an overnight with C████ on either Monday or Thursday night; (4) that Mother "shall, where ever possible, use a nanny or caregiver for the exchanges;" (5) that the parties were to "continue to use Our Family Wizard to communicate, for scheduling, and to post their routines so that they be as consistent as possible in each household;" and (6) that Father was to have "decision making as to school enrollment, medical and dental treatment for both of the children," but requiring Father to consult with Mother for her input at least four weeks before school enrollment or "significant or non-routine medical or dental treatment," and with Mother then to have two weeks to make her recommendations, which were to be considered by Father in making his decision.

In May 2014, Mother filed a Motion to Register Foreign Custody Order and a Motion to Modify Custody in the Court of Common Pleas of Lawrence County, Pennsylvania. Lawrence County Judge John Hodge concluded that Lawrence County did

2

not yet have jurisdiction to modify the Ohio Order. However, on Mother's appeal, the Superior Court reversed and remanded. After renewed filing of Mother's Petition to Modify Custody and filing of Father's Counter-Petition for Modification of Custody, the case came on for trial, which was held on December 10, 11, 14, 29 and 30, 2015 and January 5, 7, 21 and 25, 2016.

Both parties are physicians—Mother is an OB/GYN; Father is an orthopedic surgeon. They were married on August 6, 2005 and separated in August 2011. They were living in Ohio at the time. Father moved out of the marital residence and began living with his parents in New Wilmington, Pennsylvania. Mother remained in Ohio. Divorce was finalized in October 2012. Mother moved to Pennsylvania in July 2013.

W█████ has been diagnosed with autism in the moderate to severe range. He is nonverbal and has been trained to communicate by way of a laptop computer specially programmed for that purpose. He is also a "toe walker." As explained in Father's Findings of Fact (FN 1), toe walking is the inability to make heel contact with the floor during the initial phase of the gait cycle and the absence of full foot contact with the ground during the remainder of the gait cycle. When the children lived in Ohio, W█████ attended classes for children with autism at the Cleveland Clinic Lerner Center for Autism, and then the Monarch Center for Autism until the spring of 2013. In January 2013, Father registered the children for attendance in the New Wilmington Area School District in Pennsylvania, the school district that Father had attended as a child, with W█████ to be placed in a Midwestern Intermediate Unit IV ("MIU4") special class for autistic children. Although the parties agreed that C█████ would attend, and was enrolled in, the Mahoning Valley Montessori School in Ohio, the Montessori school

3

rescinded his acceptance. When the parties thereafter could not agree upon the appropriate educational program for C██████, the Ohio Court directed that C██████ attend the New Wilmington schools in the fall of 2013, where he now is in the second grade.

Because of his special needs, an Individualized Education Plan ("IEP") was developed for W██████. He now attends school at the MIU4 class designed for children with autism located at Pulaski Elementary School in the New Wilmington School District. There are six children in the class, served by a teacher trained in education of autistic children, multiple therapists, a psychologist and other staff.

As noted, *supra*, C██████ is in the second grade in the New Wilmington School system. Although diagnosed at one point in his earlier years as being on the autism spectrum, he has progressed and is developing appropriately, exhibits intelligence appropriate for his age, and, although relatively quiet and sensitive, is doing well socially and exceptionally well academically at school.

However, Mother believes that C██████ is experiencing difficulties with other students. In the fall of 2015, Mother reported that C██████ appeared upset, telling Mother of what he thought were other students' belittling and taunting actions and name-calling. Mother reported to the school that she thought that C██████ was being bullied. Upon their investigation, school officials found no evidence of bullying to support Mother's allegations.

At times, C██████ becomes upset when experiencing transitions.

On several occasions, when arriving at school, C██████ has cried and resisted exiting the car to go into the school, at times prompting school staff to provide assistance.

4

According to Mother, C███ still would not exit the vehicle. At approximately 9:30 p.m., Father texted Mother inquiring as to her intentions. Mother informed him that she was taking him to her home. However, Mother took C███ to the Jameson Hospital emergency room for evaluation.

Problems seem to arise when Mother transports or accompanies her nanny on C███' return to Father's home. Father claims that Mother is violating conditions that Judge Palos imposed on Mother when returning the children either to Father or to school. As noted, *supra,* Judge Palos' Order states that when returning the children, Mother "shall, where ever possible, use a nanny or caregiver for the exchanges." Despite the Order's directive, Mother transports or accompanies the nanny on exchanges. From Mother's testimony, it appears that Mother does not interpret the Order as restricting her presence at the exchanges, but as requiring only that a nanny should be present.

In the past, the parents have been unable to agree upon the appropriate medical treatment and educational programs for the children, and upon the appropriate treatment for W███'s autism, that, in the Ohio custody proceedings resulted in Judge Palos' Order designating Father as the parent with final authority to make decisions regarding the children's medical care and education.

Mother continues to oppose W███'s present placement in the MIU4 special class and program for autistic children, and disagrees with C███' enrollment in the New Wilmington Area School District, with the implied corollary that Father's decisions regarding education are not in the children's best interests.

In October 2013, Mother appeared at the school, demanding to see W███'s teacher and classroom. After causing serious disturbance and alarm, and loudly

confronting W████'s teacher and criticizing her with profane language in front of school staff and other children, the police were called. Criminal charges were filed against Mother that were resolved by Mother's acceptance into the Accelerated Rehabilitative Disposition program. However, as a result of her conduct, Mother is prohibited from entering the school's property. As a result, meetings to which parents are invited to attend are held off school grounds. Although Mother has now been able to interact with school staff with relative civility, W████'s teacher is remains apprehensive.

Mother requested review of the IEP that the MIU4 implemented for W████, claiming a violation of W████'s right to a free appropriate public education. Mother points to the decision of the Special Education Hearing Officer as evidence of the unacceptable faults in the MIU4 program. (Plaintiff's Trial Exhibit "5"). However, while finding serious fault with the MIU's failure to perform a functional behavioral analysis prior to devising the IEP, and, in dictum, criticizing the District and MIU for failing to collect data from W████'s previous school in Ohio in a timely fashion, the Hearing Officer, in fact, found that the MIU was providing an appropriate education for W████, found no violation of the statutory requirement, and dismissed Mother's complaint. The MIU promptly arranged for the completion of a functional behavioral analysis, as directed by the Hearing Officer.

Mother called Attorney Charles Steele, of the Pittsburgh, Pennsylvania law firm of Steele Schneider as a witness. Attorney Steele represented Mother in her challenge to W████'s IEP and the adequacy of W████'s education in the MIU4 class for autistic children. Attorney Steele's firm regularly represents parents in litigation addressing whether a child is receiving a free adequate public education. Mother also called Dr.

7

Maryann Anderson, an educational consultant employed by Attorney Steele's firm to provide expert opinion in support of clients' claims. Dr. Anderson expressed her opinion, *inter alia,* regarding the efficacy of an applied behavioral analysis regimen in the treatment of autistic children, the importance of consistency and use of the regimen in all settings, and the importance of a positive behavioral support plan and a functional behavioral analysis. She criticized W██████'s September 19, 2013 MIU4 Individual Education Plan for lack of specificity, and absence of a supporting functional behavioral analysis and positive behavioral support plan. In her Report, Dr. Anderson made two recommendations. Her first recommendation was based on her opinion that "[m]ost public schools do not have skilled certified staff who can designate their time to assuring fidelity to ABA strategies with specific children;" and that it is difficult for a regular school environment to provide a facility with "separate physical spaces designated to meet sensory needs," and "to help students learn how to regulate their behaviors without distractions," (Dr. Anderson's Report, p. 9, Plaintiff's Trial Exhibit "9"), apparently implying that the MIU4 classroom and staff were not adequate and that W██████ should be placed in a different facility and program. Her second recommendation was based on the fact that Plaintiff is not permitted on the MIU4 school grounds. Dr. Anderson had not observed W██████'s MIU4 classroom and had not interviewed the MIU4 staff.

In view of the fact that Dr. Anderson is employed by Mother's lawyer to provide expert opinions on behalf of clients, it is no surprise that her testimony was designed to advance Mother's arguments. However, aside from the possible effect of her employment on her opinions, given the generality of the basis for her first recommendation; evidence of the education, training, experience and dedication of the

8

MIU4 staff; composition of the MIU4's multiple service providers, and description of W███████'s classroom facilities and class size; together with the evidence of the MIU4's subsequent development of a positive behavioral support plan, functional behavioral analysis, re-evaluations, and revised individual education plans, Dr. Anderson's first recommendation carries little weight. In making her second recommendation, Dr. Anderson did not express any knowledge of the basis for the restrictive school policy, and did not take into account Mother's participation in school meetings and her interaction with school staff despite the school policy prohibiting her presence in W██████'s school. In any event, Mother herself, or through her litigation team, cannot validly criticize and claim inadequacy of the MIU4 for taking appropriate measures caused by Mother's grossly improper conduct.

Mother claims, also, that the program for autistic children provided by the MIU4 is inadequate and is not addressing W███████'s special needs, because, in her opinion, W██████ is not progressing but, in fact, is regressing; that the practices used by the school staff are not producing positive results; and that W██████'s maladaptive behaviors have worsened.

Mother contends that W██████'s severe finger biting became evident only after beginning the MIU4 class, and that W██████'s maladaptive behavior has worsened and has occurred more frequently during the school year. The "daily sheets" admitted into evidence (e.g. Plaintiff's Trial Exhibit "6") show the ebb and flow of W██████'s behavior at school, with W██████ apparently responding well for a period of time and then exhibiting negative behavior on other days. It appears that W██████'s finger biting occurred at regular intervals during the school year, and the evidence of W██████'s prior

9

experience showed that his finger biting was occurring prior to W████'s start of school at New Wilmington. However, it appears, also, that W████'s aggressive actions toward others began occurring as the school year progressed.

Although cognizant of W████'s continuing maladaptive behavior, the difficult task of treating autistic children is recognized also.

The evidence supports the finding that the MIU4 staff is well-qualified and extremely dedicated, that the services and programs provided are comprehensive and appropriate, and that the techniques utilized are approved and accepted in the profession. Given this finding and the testimony from W████'s teacher and other attending school professionals regarding W████ and his programs and treatment in the MIU4 classroom, the evidence is persuasive that, at least at this time, Father's decision to maintain attendance at the MIU4 is appropriate. Mother's countervailing claim and evidence are not sufficient to support a finding that the MIU4 staff and program are deficient and that W████'s attendance in the MIU4 class is not in his best interest.

Mother complains that there is a lack of necessary consistency in the programs and approaches utilized in school, at Mother's home, and at Father's home, and emphasizes the merits of the applied behavioral analysis regimen, apparently advocating that technique as the exclusive and only methodology that should be used in the treatment of an autistic child. The evidence reveals that all involved providers are well-acquainted with, and are competent in utilizing, applied behavioral analysis in practice, and that ABA theory and practice is used by all, although not exclusively in all cases, but in conjunction with other treatment and educational models under one "umbrella." Nevertheless, it appears that the approaches to W████'s treatment should be coordinated

On or about June 29, 2015, upon return of W████ to her custody, Mother noticed a difference in W███'s gait. At a follow-up appointment with W███'s then attending physician, Mother requested an x-ray that revealed a fracture in W████'s left foot.

Mother presented evidence that in early June 2015, W████'s right foot was fractured. On June 1, Mother's nanny retrieved W████ from school and took him to a neurology appointment. The nanny noticed that W████ was dragging his right foot, and took the child to Mother's office. After being notified by email, Father expressed his opinion that the problem might be caused by W████'s walking flat-footed. However, Mother proceeded to order x-rays at Jameson Hospital in New Castle. The next morning Jameson notified Mother that the x-ray showed a fracture of W████'s right foot. Mother took W████ out of school, advising Father that W████ did not feel well, and transported him to Akron Children's Hospital in Boardman, Ohio. That evening, Mother notified Father of her actions, and Father authorized the Akron Children's Hospital physician to treat W████'s foot as a fracture. However, the record from Akron Children's Hospital (Defendant's Trial Exhibit "H") indicates that, apparently the staff at Akron Children's Hospital could not identify any fracture on the Jameson Hospital x-ray.

Mother presented evidence, also, of an injury to W████'s right foot that was treated as a fracture when she took him for examination of a lump on his foot on or about November 2, 2015. Father approved the attending physician's treatment.

At trial, using an x-ray of one of W████'s fractures, Father explained the fracture as an avulsion fracture, pointing out how an avulsion fracture differs from an actual break of the bone, and testified that, on at least one occasion, there was not a new and different fracture, but rather, a failure of a previous fracture to heal.

12

On other occasions, Mother has taken the children to hospital emergency rooms for examination and x-rays. On October 7, 2014, Mother took W█████ to the emergency room because of bruises she observed on W█████'s body when he had been returned to her custody the day before. On October 20, 2014, Mother again took W█████ to the emergency room because of bruises on W█████'s body. On or about December 14, 2014, Mother transported W█████ for an x-ray of his bruised hand. On May 26, 2015 Mother took C█████ to a hospital emergency room for x-ray of his foot.

Mother testified that, on many occasions when W█████ is returned to her custody, either from Father's home or from school, bruises are observed on W█████'s body, especially in the buttocks and thigh areas. Mother has made it a practice, and has instructed her nanny, to photograph or video, W█████'s body when leaving Mother's custody and again upon his return.

Father attributes the bruises to W█████'s tendency to bruise easily and his lack of balance and agility that causes him to fall or bump into objects, as well as to the usual play activities that a young child normally experiences.

Multiple referrals have been made to Lawrence County Children and Youth Services after observation of W█████'s bruises and diagnosis of his foot fractures.

A referral was made on or about July 9, 2014 regarding W█████'s foot fracture that had been diagnosed and treated on June 16, 2014. On or about October 7, 2014, when Mother took W█████ to the emergency room because of bruises, at Mother's urging, the emergency room doctor made a referral to the Agency. On October 21, 2014, when Mother transported W█████ to the UPMC emergency room for evaluation of bruises observed on W█████'s body, another referral was made. On January 12, 2015, a referral

13

was made to the Agency on the basis that W▮▮▮ had returned home from his father's home with unexplained injuries, and that C▮▮▮▮ had informed Mother that the paternal grandfather had grabbed W▮▮▮ making him cry. A referral was made, also, on June 12, 2015, designated as a law enforcement referral. After investigation, all of the referrals were determined to be unfounded, and either screened out or the cases closed without further action, except for the January 12, 2016 referral. However, the Lawrence County Children and Youth Services intake supervisor testified that there are no concerns for C▮▮▮' safety at home or at school, and she believed that the latter referral would be closed as unfounded.

On June 6, 2015, Mother transported C▮▮▮ for a custody exchange at Father's residence. According to Mother, C▮▮▮ became very upset, crying and hysterical, stating that Mr. Kennedy messes with him. Mother drove C▮▮▮ to a Pennsylvania State Police Station for interview. After receiving information from the State Police, Mother returned to Father's residence and transferred custody to Father. Subsequently, after W▮▮▮ was returned to her custody, Mother took C▮▮▮ to the Child Advocacy Center of Lawrence County for a forensic interview. Mother was informed that there was no evidence of any conduct warranting further action.

As described, *supra,* on December 17, 2015, difficulties arose when Mother arrived at Father's residence for a custody exchange, caused, according to Mother, by C▮▮▮' erratic behavior and refusal to exit her vehicle, because, according to Mother, C▮▮▮ saw Mr. Kennedy's truck in Father's driveway. Mother took C▮▮▮ to the hospital emergency room for evaluation and again called the Child Advocacy Center. The Child Advocacy Center did not open a case.

14

In any custody proceeding, including a parent's complaint for custody or, as in the present case, a petition to modify the existing custody arrangement, the Court's main concern is the most appropriate custody arrangement for the child. 23 Pa.C.S.A. §5327(a); *K.B. v. C.B.F.*, 833 A.2d 767, 771 (Pa. Super. 2003). In a custody contest, such as the case now before the Court, where the dispute arises between two parents, the burden of proof is shared equally between the parties, as the Court will not presume that custody should be awarded to a particular parent. *Id.* In making its determination, the Court bases its conclusion on how the best interests of the child may be served. *Arnold v. Arnold,* 847 A.2d 674, 677 (Pa. Super. 2004). Specific factors that a court must consider are set forth in 23 Pa.C.S.A. §5328(a).

As in many custody cases, so in the instant case, both parents are requesting primary physical custody, and, to that extent, both parents are interested in limiting the other's contact with the children. Given the conflict between the parties, it would not be surprising to find that each of the parties would prefer as much time as possible with the children, if only to minimize the opportunities for disagreement and argument.

That obvious aspect aside, considering Mother's disparagement of Father's parenting abilities, her allegations of Father's disregard for the children's well-being and accusations of failure to take care of their needs, and her opposition to Father's decisions regarding the children's schooling and implementation of a treatment plan of W███████'s autism, it is apparent that Mother would be unlikely to encourage extended liberal continuing contact between the children and Father. However, especially when taking into account Mother's proposed order, it does not seem likely that Mother would attempt to eliminate contact.

15

On the other hand, it could be expected that Father would welcome less contact with Mother, but with that aversion to contact a logical response caused by Mother's unwarranted overbearing actions. Mother's constant messaging by text and email serves to discourage immediate and unfailing response. It could be expected, also, that Father legitimately would prefer that the children not be subjected to Mother's proclivity for regular unfounded referrals to children and youth agencies and police with consequent repetitive interviews and investigations, and that they not be exposed to Mother's conduct and statements in the children's presence regarding the children's care when in Father's custody, that can be taken only as criticism and accusation against Father. However, there is no evidence that Father would attempt to eliminate the children's contact with Mother.

As reflected in the custody schedule established in the accompanying March 10, 2016 Order, the Court concludes that Father's request for further restriction on Mother's custodial time with C████ is warranted.

Mother's referrals to the Pennsylvania State Police and to Lawrence County Children and Youth Services are outlined, *supra*. All of the allegations have been dismissed as unfounded, except the referral of January 12, 2016, that remains under investigation.

The effect on the children, and on C████, in particular, of the regular photographing and video recording of W████ and the custody exchanges, unfounded referrals to Children and Youth Services and the Children's Advocacy Center, the subjecting of C████ to State Police interview, disparagement of Father's care and of the

16

children's school, and unwarranted interference with the children's school and education, provides strong evidence supporting Father's primary custody of C██████.

The fractures incurred by W██████ and the bruises observed by Mother are a concern. However, there is no evidence that the fractures and bruises are caused by neglect, or from any cause other than W██████'s vulnerability to bruising, his self-injurious behavior, and the effects of his autism on his gait and balance. Of special interest was Father's explanation of the type of fracture observed on the x-ray of W██████'s foot.

Both parties are able, and can be expected, to provide adequate physical safeguards and supervision of the children. However, Father must acknowledge the benefit of, and ensure, diligent monitoring of W██████ so that prompt notice of injury and any necessary treatment can be given to Mother. Hopefully to allay any suspicion and mistrust, Father should assure Mother of diligent monitoring of W██████ while he is in Father's care, and promptly report any injury to Mother, together with explanation.

Both parents perform the routine duties expected of a parent when the children are in their care. Each parent provides the basic necessities and interaction with the children that accompanies parental responsibility. Father is involved with the children's schooling and W██████'s special education program, the children's extracurricular activities, exposure to religious experience, and play activities. Mother is involved in the children's education and schooling as well, and interacts with the children in activities when they are with her.

However, although obviously involved, Mother's attitude toward several facets of the children's upbringing and care must be noted as counterproductive.

17

Mother's interest in the children's education is intense, but to the extreme of attempting to impose her opinions, recommendations and choice of educational program and school upon Father and others involved in the children's care. This overly aggressive activism is illustrated by her relentless requests of W████'s school and teachers for information, her constant criticism of the MIU4's program and teachers, and her seriously inappropriate conduct at W████'s school in October 2013, described, *supra*.

Although obviously interested in the children's medical care, Mother refuses to follow the directive in Judge Palos' Order giving Father authority over the children's schooling and medical treatment, to the point of independently taking the children for x-rays, diagnosis, and treatment.

The unwillingness to consider opinion and observations of others involved in the children's care that are contrary to her beliefs, the attempts to impose her views upon others without considering the evidence supporting their opposing positions, and her frequent behavior and actions in the company of the children implying disparagement, wrongdoing and misconduct on the part of Father and other caregivers, can only serve to cause undue stress and anxiety in the children's minds and plant the seeds of antipathy toward Father and other caregivers that will not serve the children's best interests.

Given the inability to discuss and arrive at even a common ground to serve as the basis for decision-making regarding the children, and Mother's efforts to interject conflict and crisis into the children's lives by refusing to accept the provisions of the presently governing Order, creating supposed emergencies from what should be dealt with as incidents to be resolved by calm discussion and agreement, and by intervention in the children's educational program and school environment that can be described only as

18

disruptive, compared with the relatively consistent, straight-forward, and experience-based approach exhibited by Father, consideration of the statutory factor designated as the need of the children for stability and continuity in education, family life and community life weighs in favor of an order that attempts to enhance the influence and presence of Father in the children's lives.

Father's parents live in close proximity to Father and, after Father moved to his present residence, became closely involved with the children, providing supervision and caregiving when needed, as well as enjoying the relationship that normally exists between grandparents and grandchildren.

Mother's parents live in Ohio and, therefore, do not have frequent contact with the children, although there is no evidence that the children do not enjoy a good relationship with the maternal family.

However, because of W████'s special needs and Mother's concern regarding ability to provide unassisted care in an emergency, the March 10, 2016 Order requires a qualified caregiver to be present with W████.

W████ and C████ enjoy a very close relationship and bond that should be considered when devising a custody schedule that will serve their mutual best interests.

W████ became 9 years old while this case was being tried, but, as noted above, is nonverbal and was not interviewed. C████ is only 7 years old, will be 8 in June, and was not interviewed.

There is insufficient evidence that ether parent attempts directly to turn the children against the other. However, as expressed in some detail, *supra,* it must be recognized

that Mother's frequent conduct implying criticism of Father, and her words disparaging Father's abilities and choices, can be expected to poison the children's minds.

It is apparent that each of the parents, in his or her own style, love and care for the children and want only the best education and environment for their development. However, Mother's volatile nature and conduct; her constant opposition to the views, opinions and decisions of others; her disruption of the children's educational program; her interpretation of circumstances as presenting crisis and necessitating emergency action; her beliefs about C████' health, mental status, interaction with other students, and adjustment at school that are not borne out by the available evidence and reports from those entrusted with his care; her actions that inappropriately involve the children in the custody dispute and in Mother's disagreement with the children's school program; provide strong argument that Mother is less likely to maintain a stable, consistent and nurturing relationship with the children adequate for their emotional needs.

Both parties can be expected to attend to the daily physical needs of the children, and the special needs of W████. Both parties employ qualified tutors and nannies, and have arranged for therapeutic staff support in their homes. However, in this regard, the evidence of inappropriate conduct by one of Father's previously hired nannies is noted. Also noted is Father's prompt remedial action after being advised of the circumstances. Nevertheless the incident should alert Father to the need to ensure a comprehensive investigation of potential nannies and other caregivers, including personal contact with references, to eliminate, to the extent possible, any further incident, and to alert Father to the need for close and diligent monitoring.

20

If one were to consider only time spent and effort exerted, the evidence might support the conclusion that Mother is more likely to attempt to attend to the children's daily emotional, developmental and educational needs. However, although expending a great amount of time presuming to attend to, and expressing intense interest in, the children's development, Mother engages in conduct that causes one to question the quality of her involvement, including, for example, interference in the children's educational process by seriously inappropriate aggressive behavior and excessive continual and repeated requests for information and detail from the school personnel; the disregard shown for the medical and educational decision making procedure and other direction contained in the Ohio Court's November 1, 2013 Order, including her strained and self-serving interpretation of the requirement of third-party transportation for custody exchanges; her frequent initiation of emergency room treatment and requests for x-rays when a more deliberate approach appears to have been called for after consultation with Father; and her including the children in various aspects of the custody dispute by disparagement of Father and other caregivers in the children's presence, and involvement of C█████ in photographing W█████. These examples of Mother's overreaching and counterproductive behaviors supports the conclusion that, although subjectively well-intentioned, Mother would be less likely than Father to attend actually and properly to the daily emotional, developmental and educational needs of the children.

The parties live in close proximity and, therefore, distance between residences is not a factor. However, the parties live in different school districts, and it would not be in the children's best interests to establish a custody arrangement that required the children to change schools.

21

As noted, *supra,* both parties employ nannies and tutors in their respective residences. Father's parents also have assumed an active role in providing supervision and care when needed. Appropriate childcare arrangements are available to both parents.

The level of conflict between the parties is extreme. They are not able to communicate effectively in person and disagree upon almost all facets of the children's care. As a result, it is not practical to expect that the provisions of a court order will cause the parties suddenly to be able to interact, discuss issues and reach amicable resolution of important issues regarding the children's care, guidance and development.

With respect to communication itself, as noted by the Guardian Ad Litem in his Report, it appears that both parties are somewhat at fault. Mother's communications are excessively numerous and detailed, which, in turn causes Father's sometimes erratic or delayed response, and his communication at times by excessively short and incomplete messages. Based on the history of the case and the findings and conclusions expressed above in this Memorandum, as well as a review of the emails and texts admitted into evidence, the reasonable inference is that Father is reacting to the frequency, volume and tone of Mother's requests and comments. However, communication is a two-way street, and although possibly annoying or an irritant, in the interest of attempting to foster a more cooperative and less antagonistic interaction, Father should be more attentive to ensuring complete and prompt response to Mother's questions, and should be more willing to initiate proposals for discussion that might lead to some agreement, at first on small issues, but hopefully, as time passes, to productive discussion of the more difficult questions.

In addition, the evidence supports a finding that, at times, Father does not communicate with Mother regarding proposed medical and educational decisions, and fails to provide Mother with complete and timely information regarding the children's activities. Father is reminded and admonished to ensure timely prior notification of Mother of the times and dates of all scheduled appointments, and information regarding other events and activities of which Mother might not be not aware.

Mother is reminded and admonished to comply with the provisions of the accompanying Order that award sole legal custody to Father. Unilateral action regarding medical, educational and other important issues involving the children without consultation with, and the express approval of, Father cannot be tolerated.

There is no evidence of a history of drug or alcohol abuse on the part of either party or members of their households.

In 2012, Mother was diagnosed with narcissistic personality disorder.

There is no evidence that either party suffers from any physical condition that affects ability to care for the children.

After granting Mother's motion for appointment of a Guardian, by agreement of the parties, attorney Ryan C. Long, a member of the Lawrence County Bar, was appointed Guardian Ad Litem for the children. Attorney Long performed an extensive investigation, submitted his Report and Recommendation, and testified at trial.

Attorney Long recommended that the existing custody schedule be modified to provide that Father have sole legal custody of the children; that C█████ live primarily with Father, with alternate weekend custody with Mother; and, although not opposing the

23

same schedule for W████, that the existing alternate week schedule be maintained for W████.

Review of the many and extensive Exhibits and record of the nine-day trial was time-consuming. However, time must be taken in any custody case for careful deliberation, and especially in a case such as the instant one where the record is voluminous. After review of the record, evaluation of the evidence applicable to each of the statutorily required factors, and consideration of the Guardian's Recommendation and counsel's Proposed Findings of Fact and Conclusions of Law, the Court entered its March 10, 2016 Order that this Memorandum accompanies, which awards sole legal custody of the children to Father; primary physical custody of C████ to Father, and partial physical custody to Mother on alternating weekends; shared physical custody of W████ to the parties on an alternating weekly basis; specified summer and holiday custody; and liberty to the parties to modify the schedule if they mutually agree.

After evaluating the evidence in the light of the factors mandated for consideration by statute, the evidence preponderates in favor of providing C████ with a more stable, less contentious, and more engaging environment that hopefully will encourage a more accepting and stable outlook and ability for C████ to adjust to transition. It is expected that with less turmoil regarding school and custody, C████' aversion to entering school will subside.

As indicated, *supra,* when discussing the applicable statutory factors, Mother's overbearing attitude and conduct, including continual disparagement of the New Wilmington schools, involving the children in repeated trips to medical facilities and law enforcement, routine photographing of W████, and outward expression of disdain for

the decisions and care provided by others, must be taken into account. Mother's erratic behavior must cause stress for the children that can be expected to exhibit itself in expression of anxiety and in unpredictable behavior.

The history of the custody dispute and litigation cannot be ignored, including Ohio Common Pleas Court Judge Palos' November 1, 2013 Order that established the present custodial arrangement.

The evidentiary scales are tipped in favor of C██████' primary physical custody with Father as reflected in the March 10, 2016 Order. Weighing heavily in favor of extended periods of custody with Father are C█████' need for stability and continuity in education, family and community life; maintenance of a stable, consistent and nurturing relationship adequate for his emotional needs; attention to his physical, developmental and educational needs; and the inability of Mother to consider the views and opinions of others that might differ from her views and opinions.

Adding to the logic of the custody arrangement established by the March 10, 2016 Order is the strong recommendation of the children's Guardian Ad Litem.

Recognition is accorded the policy that siblings should be raised together whenever possible, referred to by Mother's counsel, citing to *Johns v. Cioci*, 865 A.2d 931 (Pa. Super. 2004) (citing *Wisoski v. Wiskoski*, 629 A.2d 999 (Pa. Super. 1993)). However, as the Guardian Ad Litem suggests, because of the differing needs of the two boys, the custody arrangement appropriate for W██████ might not coincide with the schedule that is in C█████' best interest.

Because of W█████'s need for supervision, special care, therapy and tutoring programs, and Mother's intense interest in overseeing and monitoring W█████'s therapy,

25

tutoring and other special programs, it is concluded, as noted by the Guardian, that Mother should continue to share physical custody of W⬛⬛⬛ with Father on an equal time basis.

However, C⬛⬛⬛' needs and interests differ, and although contact between the siblings is to be encouraged to maintain the sibling bond, the evidence suggests that C⬛⬛⬛ is in need of the stability provided by a less volatile atmosphere, and an environment absent Mother's constant preoccupation with the custody dispute and embroilment of C⬛⬛⬛ in that dispute, and without the risk of being influenced by Mother's outspoken criticism of his school. Also, the schedule established by the March 10, 2016 Order will provide C⬛⬛⬛ with the opportunity to grow without the influence of W⬛⬛⬛'s special needs, and to become more independent and able to deal more readily with transitions.

At least for the time being, recognition of W⬛⬛⬛'s special needs and the logic of addressing the differing interests of C⬛⬛⬛ overrides the policy that siblings be raised together.

Given the extreme inability of the parties to communicate effectively, and to discuss compromise and reach agreement on the basic issues involving the children's care, schooling and development, shared legal custody is not a viable alternative. Given Mother's uncompromising attitude and approach to child-rearing in this divorced parent situation; her inability to consider any alternative that does not coincide with her position; her disregard for the authority granted Father in Judge Palos' Order; her erratic behavior; and her willingness to subject the children to the potentially traumatizing effect of repeated trips for "emergency" treatment, Children and Youth Services and other agency

involvement and interview by aw enforcement, with the inevitable implication disparaging of Father, the award of sole legal custody to Father is warranted.

After evaluation of the evidence and statutory factors, and having considered the parties' and counsel's arguments and the Guardian Ad Litem's recommendations, it was determined that the custody arrangement and direction contained in the March 10, 2016 Order best serves the children's interests.

THE PROTHONOTARY SHALL SERVE A COPY OF THIS ORDER UPON COUNSEL OF RECORD AND UPON RYAN LONG, ESQ, GUARDIAN AD LITEM